NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-12017


COMMONWEALTH  vs.  CAIUS VEIOVIS.



Berkshire.    November 10, 2016. - July 19, 2017.

Present:  Gants, C.J., Lenk, Hines, Gaziano, & Lowy, JJ.


Homicide.  Evidence, Photograph, Relevancy and materiality, Inflammatory evidence, Prior misconduct, Identity, State of mind, Motive.  Practice, Criminal, Capital case, Argument by prosecutor, Instructions to jury.



Indictments found and returned in the Superior Court Department on October 6, 2011.

The cases were tried before C. Jeffrey Kinder, J.


Dana Alan Curhan (Christie L. Nader also present) for the defendant.
David F. Capeless, District Attorney for the Berkshire District, for the Commonwealth.


GANTS, C.J.  The defendant was found guilty by a Superior Court jury on three indictments charging murder in the first degree on the theory of deliberate premeditation for the grisly

killing of David Glasser, Edward Frampton, and Robert Chadwell.[1] The Commonwealth's theory of the case was that the defendant participated in these killings with Adam Lee Hall and David Chalue to prevent Glasser from testifying against Hall in two criminal cases. They kidnapped Frampton, who was Glasser's roommate, and Chadwell, who was Glasser's neighbor, simply because Frampton and Chadwell had the misfortune of being in Glasser's apartment when they entered to kidnap and later kill Glasser, and then killed Frampton and Chadwell to ensure their silence regarding the kidnapping and killing of Glasser. After the three victims were killed, the defendant, Hall, and Chalue dismembered their bodies and placed the body parts in plastic bags, and Hall arranged for the burial of the plastic bags.[2]

The defendant presents four primary claims on appeal: (1) that the evidence of his knowing participation in these crimes was insufficient as a matter of law to support his convictions; (2) that the judge abused his discretion in admitting evidence of other acts the probative value of which was outweighed by the risk of unfair prejudice; (3) that the judge abused his discretion in admitting in evidence a statement by the defendant

---

[1] The defendant was also found guilty on three indictments charging kidnapping and three indictments charging witness intimidation.

[2] Adam Lee Hall and David Chalue were found guilty of the three murders in separate trials that preceded the defendant's trial.

regarding the scars on his right arm; and (4) that the prosecutor presented facts in closing argument that were not supported by the evidence at trial. We affirm the convictions and conclude that the defendant is not entitled to relief under G. L. c. 278, § 33E.

Background. Because the defendant challenges the sufficiency of the evidence at trial, "we recite the evidence in the Commonwealth's case-in-chief . . . in the light most favorable to the Commonwealth." Commonwealth v. Penn, 472 Mass. 610, 611-612 (2015), cert. denied, 136 S. Ct. 1656 (2016). We focus primarily on the evidence implicating the defendant in the joint venture, because the defendant does not dispute that there was abundant evidence that Hall and Chalue participated in the killings.

The circumstances leading up to the killings began in July, 2009, when Hall beat Glasser with a baseball bat because he believed that Glasser had stolen and sold motor vehicle parts that belonged to Hall. While Glasser was being interviewed by a State police trooper two days later, Hall threatened Glasser in a telephone call. The State police arrested Hall that day and recovered a baseball bat from Hall's vehicle.

In July, 2010, while the charge against Hall of assault and battery by means of a dangerous weapon was pending, Hall concocted a scheme to discredit Glasser by framing him on a

false kidnapping charge. As part of this scheme, a friend of Hall, Nicole Brooks, falsely reported to the police that Glasser kidnapped her and shot at her when she escaped; another friend of Hall, Scott Langdon, planted Brooks's wallet and a revolver in Glasser's truck, where they were found by police during a search of the truck. The scheme resulted in Glasser's arrest, but the police soon exonerated Glasser and brought criminal charges against Hall and those who participated with him in the scheme.

The defendant began spending time with Hall and Chalue in the latter half of August, 2011. Hall was a "sergeant [at] arms" in a local chapter of the Hells Angels motorcycle club and was described as an "enforcer." The defendant was not a member of the Hells Angels, but there was evidence that he wanted to be. He began to wear a vest with a Hells Angels insignia on the front and kept a Hells Angels sticker in his Jeep and apartment. Hall told a witness in the defendant's presence of the possibility that the defendant would get a motorcycle and become a prospective member of the Hells Angels. The defendant's employer told the police that the defendant had wanted to establish credit because he wanted to buy a motorcycle and that "you cannot be in the Hells Angels without buying the motorcycle."

The time line of events before and after the killings is important in evaluating the weight of the evidence implicating the defendant as a participant in the killings. On Friday, August 26, 2011, Hall picked up a friend, Katelyn Carmin, in the tan Buick vehicle[3] he had purchased earlier that month; the defendant and Chalue were with him. While driving around to various bars, Hall went into a tirade about a person he called "Drummer Dave,"[4] who he said had robbed him and then "snitched" on him. Hall said he was "going to kill that motherfucker." The defendant, along with Chalue, responded to Hall by assuring him that Hall will "get him." Later that evening, they drove to the Hells Angels clubhouse in Lee, where they rode in an all-terrain vehicle. Hall told Carmin to be careful because he needed the defendant and Chalue for "a job."

On Saturday, Hall was seen outside the building where the defendant's girl friend resided, talking to the defendant while sitting in the girl friend's pickup truck. In the early

---

[3] The Buick at other times during the trial was described as gold in color.

[4] Andrew Johnston, a childhood friend of Robert Chadwell, testified that people often referred to David Glasser by his nickname, "Drummer Dave." [5] There was some confusion as to the color of the vehicle that was at Rose Dawson's residence at 1:30 A.M. Edwin Sutton, Rose's father described it as a Jeep Wrangler and testified that, although he was not sure, he thought it might have been yellow. Ocean Sutton, one of Edwin's daughters, described it as a green Jeep Wrangler. The defendant's Jeep is black.

afternoon, Hall, Chalue, and the defendant went to a party held by the Springfield chapter of the Hells Angels at a tavern in Springfield; Hall and the defendant left the party together early in the afternoon and returned at approximately 4:30 P.M. Hall, Chalue, and the defendant left the tavern together at approximately 6:30 P.M., and drove away in Hall's Buick. Later that evening, Hall, Chalue, and the defendant were at the Hells Angels clubhouse in Lee; they left later to go to the defendant's house in Pittsfield. Hall drove to the defendant's home in his own vehicle but first stopped at Steven Hinman's home in Lenox. Hall showed Hinman a .45 semiautomatic pistol that he had in his vest, as well as a "dog food bag" that contained a .44 Magnum revolver, a sawed-off AR-15-type weapon, and a small revolver.

The defendant and Chalue traveled to the defendant's home with two women, Allyson Scace and Kayla Sewall, in Sewall's vehicle after stopping at a liquor store. When Hall arrived at the defendant's home, he pulled the firearms out of the dog food bag and asked the defendant where he kept brake cleaner and gloves. The defendant directed him to a cabinet and went upstairs with Sewall. While they were upstairs, Hall and Chalue disassembled and cleaned the firearms. The defendant asked Sewall to stay, but she declined and left with Scace at

approximately 9 P.M., leaving Hall, Chalue, and the defendant alone in the apartment.

The kidnapping of the three victims in Glasser's apartment in Pittsfield occurred shortly before midnight that Saturday or early Sunday morning. Glasser's upstairs neighbor asked Glasser to move his truck at approximately 10:30 P.M. that Saturday, and saw the three victims (and a fourth man) in the kitchen of Glasser's apartment at that time. The last telephone call made from Chadwell's cellular telephone was at 11:21 P.M. Shortly after midnight, the upstairs neighbor heard banging from the front downstairs hallway, and heard the voices of Glasser and Frampton, as well as some unfamiliar voices. Hall later told a friend, Rose Dawson, that, when they arrived at Glasser's apartment, one of the victims was using a computer and another was playing a video game.

The defendant's girl friend had returned from a hiking trip on Friday night and was at her home on Saturday night. She made a telephone call to the defendant's cellular telephone at 12:09 A.M. on Sunday, but the defendant did not answer and she left a voicemail message. She sent him a text message on his cellular telephone at 1:20 A.M., but received no reply. She telephoned him again at 1:40 A.M., and again left a voicemail message after the call was not answered.

At approximately 1:30 A.M. on Sunday, Hall appeared at Dawson's home in Pittsfield. He asked to borrow Dawson's cellular telephone, which she gave to him; he said he would be back soon. He entered the passenger seat of a vehicle described as a Jeep Wrangler[5] and left; the defendant owned a Jeep Wrangler.

Hall was next seen at a convenience store in Pittsfield at approximately 5:30 A.M., where he purchased three candy bars and a pack of cigarettes. Hall returned a few minutes later and purchased a pack of Black and Mild cigars. The police seized the defendant's Jeep seven days later and subsequently searched it; they found a Black and Mild cigar wrapper inside. On September 12, in a search of the defendant's apartment, to which he had recently moved, the police found four or five Black and Mild cigar wrappers in a duffle bag.

The store clerk observed that Hall had mud on his shirt and that his boots and blue jeans were wet, as was the cash he handed over to pay for the items. Tropical Storm Irene had reached western Massachusetts during the night, bringing heavy rain and high winds for much of the night and into the morning.

---

[5] There was some confusion as to the color of the vehicle that was at Rose Dawson's residence at 1:30 A.M. Edwin Sutton, Rose's father described it as a Jeep Wrangler and testified that, although he was not sure, he thought it might have been yellow. Ocean Sutton, one of Edwin's daughters, described it as a green Jeep Wrangler. The defendant's Jeep is black.

Shortly thereafter, Hall returned to the Dawson residence and parked his Buick on the front lawn. The defendant's Jeep arrived behind the Buick. Hall walked from the Buick to the Jeep and left in the Jeep.

At approximately 10:30 A.M., Hall returned to the Dawson residence with Chalue and the defendant in the defendant's Jeep, which Hall was driving. Hall, who was wet and not wearing shoes, asked Dawson and her friend, Alexandra Ely, who was staying overnight with Dawson, to come to Hall's home to make breakfast. Hall gave them money, which was soaking wet, and told them to buy breakfast food and bleach; he also told them to wash their hands after handling the money. As Dawson and Ely drove to a supermarket in Hall's Buick, Hall telephoned Ely and told her to skip the bleach and not look in a bag in the vehicle. They looked inside the bag and saw what looked like a "batting glove or golf glove."

When they arrived at Hall's house, the defendant's Jeep was parked in front; Hall, Chalue, and the defendant were inside. Hall returned Dawson's cellular telephone to her and told her to delete her call log and tell no one that he had borrowed it. Chalue was in bed, and the defendant sat in a recliner "sleeping" and looking "tired." Dawson and Ely left later in Hall's Buick to return home. Hall, Chalue, and the defendant retrieved the Buick from Dawson's home later that day.

At approximately 2 P.M., Hall arrived at the home of David Casey in Canaan, New York, approximately eighteen miles from Pittsfield, in the Buick. Hall said that he was having trouble with his vehicle and asked Casey if he knew anywhere nearby where he could park it overnight. Casey called a friend, Alan Pavoni, who agreed to let Hall park the vehicle in Pavoni's driveway in Becket. Hall then told Casey that he had killed Glasser, as well as "a fat guy" and a black man who were with Glasser. He explained that he had held Glasser down and pulled the trigger, but the gun misfired. As he tried to rechamber another round, Glasser ran into the woods. "Davey" ran after him and shot him, but did not kill him. "Davey" brought Glasser back to Hall, who then shot him. Hall said the other two men were stabbed to death. He said they thought the black man was dead and left him but, when they came back, they saw him sitting on a log, moaning. Hall also said that they "chopped [the victims] up," and added that "one of the guys really enjoyed torturing and cutting them up." Hall noted that it was "raining very hard" while this was happening.

Hall asked if Casey was still working with an excavator at a property in Becket, and Casey said that he was. Hall then asked if Casey would do him a favor; he wanted Casey to dig a hole to bury the bodies. Hall added that, if Casey did this

favor for him, he would not harm Langdon.[6]  Hall wanted to go

with him to dig the hole that day, but Casey said he would meet

him there on Monday morning.

Between 5 and 6 P.M., Hall drove his Buick to Pavoni's

property and parked it there; another person was with him in the

Buick.  A "Jeep-like vehicle" also arrived and picked up Hall.

Hall, Chalue, and the defendant were seen late in the

afternoon standing near the defendant's Jeep in the parking lot

of the apartment building in Pittsfield where the defendant's

girl friend resided.

Casey met Hall as scheduled at approximately 8:30 A.M. on

Monday at Pavoni's property.[7]  Hall was with a man he identified

as "Davey," whom Hall assured Casey he could trust because the

man was a member of the Aryan Brotherhood, and a person had to

kill someone to become a member; Casey identified this man at

trial as Chalue.  Hall opened the trunk of the Buick and said

that it was "starting to smell."  Hall later drove the Buick to

the property where Casey kept the excavator.  Casey used the

excavator to dig a large hole, and Hall opened the trunk and

---

[6] David Casey testified that Scott Langdon was living with
and planned to marry Casey's sister.  Casey knew that Langdon
was cooperating with the police regarding the pending charges
against Hall.

[7] The defendant arrived for work as usual on Monday morning
at the design firm where he was employed as a gardener.

dropped a number of plastic garbage bags, which Hall said contained body parts, into the hole.

On Monday afternoon, Hall and Chalue brought the Buick to a salvage yard and sold it for scrap, where it was later placed in a crusher. The interior carpets were coated with liquid, the back seat was mostly missing, and the carpet had been removed from the trunk. On Sunday, September 4, Hall, Chalue, and the defendant drove past the salvage yard in the defendant's Jeep, and then drove back in the other direction, arguably for the purpose of checking to see that Hall's Buick had actually been crushed. After they were stopped by police at a nearby gasoline station, the police seized and searched the Jeep, but found nothing of evidentiary value.

On Friday, September 9, after Casey had revealed to police the location of the bodies, the police dug up the plastic bags containing the victims' body parts. The autopsy of the body parts revealed that all of the victims had been shot and stabbed; their neck, arms, and legs had been removed, and two of the bodies had been cut through the torso. Most of the dismemberment had been accomplished by chopping or hacking with a sharp instrument such as a butcher knife.

On September 10, the defendant was arrested and brought to the Pittsfield police station. At the station, a State police lieutenant told the defendant that he was protecting a "rat,"

referring to Hall, because Hall had offered to cooperate with the Federal Bureau of Investigation regarding the Hells Angels clubhouse in Lee a year earlier. As the defendant was walking back to his cell, the defendant said to Chalue, "[Y]ou hear what they're saying about our partner? They're saying he's a stoolie."

On September 12, the police executed search warrants at two apartments in the same building in Pittsfield: an apartment where the defendant lived and an apartment from which he had recently moved. In the apartment where he lived, among other items that will be described later in this opinion, the police found a September 6 edition of a newspaper with an article describing the disappearance of the three victims, and an article dated September 8, describing the search for the missing men.

Discussion. 1. Sufficiency of the evidence. In reviewing a claim of insufficiency of the evidence, we determine whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (emphasis in original). Commonwealth v. St. Hilaire, 470 Mass. 338, 343 (2015), quoting Commonwealth v. Latimore, 378 Mass. 671, 677 (1979). The defendant notes accurately that there was no percipient witness who testified to the defendant's

participation in the killing and dismemberment of the three victims, and no forensic evidence that linked him to the crimes. Circumstantial evidence, however, "alone may be sufficient to meet the burden of establishing guilt." Commonwealth v. Woods, 466 Mass. 707, 713, cert. denied, 134 S. Ct. 2855 (2014). We conclude that the evidence was sufficient in this case to support a finding beyond a reasonable doubt that the defendant, with the intent to kill, knowingly participated in the premeditated murder of the three victims. See Commonwealth v. Zanetti, 454 Mass. 449, 467 (2009).

A reasonable jury could have found that the defendant was aware on the Friday before the killings that Hall planned to kill Glasser in order to silence him as a witness. They also could find that the defendant had a motive to assist Hall in killing Glasser, because he wanted to be a member of the Hells Angels chapter where Hall served as sergeant at arms, and helping Hall in the killing would curry favor with Hall and cause Hall to believe him worthy of trust.

On Saturday evening, shortly before the victims were kidnapped and killed, the defendant was with Hall and Chalue at the defendant's home when they disassembled and cleaned multiple firearms that Hall had just brought. At approximately the time of the kidnappings and killings, the defendant failed to answer two telephone calls and a text message from his girl friend. As

described by Hall in his conversation with Casey, Hall, Chalue, and a third assailant brought the victims to the woods in the heavy downpour of the tropical storm, killed them, and dismembered their bodies.[8]  It can reasonably be inferred that the dismemberment of the victims took a substantial period of time to accomplish and that it would have been bloody and messy work in a tropical storm.  It is therefore probative that Hall was a passenger in what reasonably could be inferred to be the defendant's Jeep at approximately 1:30 A.M., when Hall stopped at the Dawson residence.  It can also reasonably be inferred that Chalue and the defendant were still with Hall at approximately 5:30 A.M., because Hall purchased three candy bars at the convenience store and a brand of cigars smoked by the defendant.  This inference grows stronger when one considers that the defendant's Jeep followed Hall when he dropped the Buick off at the Dawson residence shortly after leaving the convenience store, and that Hall immediately left in the Jeep.  Because nothing of evidentiary value was found in the Jeep, it can be inferred that the victims' dismembered bodies by this time were in the trunk of the Buick.  The defendant was still

---

[8] Hall's statements to Casey were admissible for their truth against the defendant because they were made to induce Casey's cooperation in burying the bodies and therefore were made in the course of and in furtherance of the joint venture.  See Commonwealth v. Winquist, 474 Mass. 517, 522 (2016), and cases cited.

with Hall and Chalue when they returned to the Dawson residence at 10:30 A.M., with Hall now driving the defendant's Jeep, and continued with them to Hall's house later that morning in the Jeep, where the defendant appeared to be sleepy.

There was credible evidence that a third person participated in the killings and dismemberments with Hall and Chalue, and that the defendant was the only third person with Hall and Chalue immediately before and immediately after the killings. Moreover, Hall was seen in the defendant's Jeep at or around the time period when the bodies were likely being dismembered. If the defendant had not participated in the killings, it is unlikely that he would have chosen to keep newspaper articles about the disappearance and the search for the victims in his apartment or that he would have referred to Hall in a conversation with Chalue as "our partner." In light of this evidence, a reasonable jury could have found beyond a reasonable doubt that the defendant was the third person who participated in the killings and subsequent dismemberments.

2. <u>Admission of photographs of items found in defendant's apartment</u>. The defendant argues that the judge abused his discretion in admitting photographs of items found during the search of the defendant's apartments because their probative value was outweighed by the risk of unfair prejudice. The defendant moved in limine to bar these items from evidence, but

the judge denied the motion.  The objected-to photographs show (1) anatomical drawings from a medical textbook with images of human dissections and amputation of body parts, some of which were presented as a collage hung on the wall; and (2) a machete, a cleaver, hatchets, various knives, and a baseball bat with spikes.

The nature of so-called prior bad act (or other act) evidence under Mass. G. Evid. § 404(b) (2017) is that it reflects badly on the character of the defendant and might show a propensity to commit the crime charged, which poses a risk of unfair prejudice to the defendant.  If it is offered solely for that purpose, it is not admissible.  But if it is offered for a purpose other than character or propensity, such as to establish motive, opportunity, intent, preparation, plan, knowledge, identity, or pattern of operation, the evidence is admissible where its probative value is not outweighed by the risk of unfair prejudice to the defendant.  See Commonwealth v. Crayton, 470 Mass. 228, 249 (2014).  See also Commonwealth v. Drew, 397 Mass. 65, 79 (1986), S.C., 447 Mass. 635 (2006), quoting Commonwealth v. Bradshaw, 385 Mass. 244, 269 (1982) (prosecution may not introduce evidence that defendant previously misbehaved for purpose of showing his or her bad character or propensity to commit crime charged, but such evidence may be admissible if "relevant for some other purpose"); Commonwealth v. Trapp, 396

Mass. 202, 206 (1985) (prior bad act admissible where it is not offered to demonstrate that defendant acted in conformity with his or her past actions but rather to "prove a relevant subsidiary fact"). See generally Mass. G. Evid. § 404(b). We give great deference to a trial judge's exercise of discretion in deciding whether to admit a prior bad act, and we will reverse for an abuse of discretion only where the judge made "'a clear error of judgment in weighing' the factors relevant to the decision, . . . such that the decision falls outside the range of reasonable alternatives." L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014), quoting Picciotto v. Continental Cas. Co., 512 F.3d 9, 15 (1st Cir. 2008).

Here, there were three relevant, noncharacter purposes to the admission of the amputation drawings and the collage of anatomical drawings. First, their admission was probative of the identity of the defendant as the third man who participated in the killings. A critical piece of evidence in this case was the statement made by Hall in furtherance of the joint venture that "one of the guys really enjoyed torturing and cutting [the victims] up." Evidence that the defendant chose to put on his wall anatomical drawings showing the dissection of the human body and chose to possess drawings depicting the amputations of arms and legs tends to identify the defendant as the person who likely fit Hall's description of the third accomplice as someone

who enjoyed "cutting [the victims] up."  If Hall had said that the third person who participated in the killings was fascinated by medieval weapons, it would have been highly probative of identity if one of his friends had photographs of such weapons on his wall and a collection of such weapons on his mantel.  The collage and drawings in the defendant's apartment are no less probative of identity.

Generally, we characterize other act evidence that is admissible to show identity as "modus operandi" evidence and allow its admission only where "the prior events and the circumstances of the crime charged have such similarities as to be meaningfully distinctive" (citation omitted).  Commonwealth v. Jackson, 417 Mass. 830, 836 (1994).  See, e.g., Commonwealth v. Holliday, 450 Mass. 794, 815, 555, cert. denied sub. nom Mooltrey v. Massachusetts, 555 U.S. 947 (2008); Commonwealth v. Montez, 450 Mass. 736, 743-746 (2008).  The theory underlying its admission is that the distinctive commonality between the prior or subsequent conduct and the charged act creates "a sufficient nexus to render the conduct relevant and probative" on the issue of identity (citation omitted).  Commonwealth v. Walker, 442 Mass. 185, 202 (2004).  We require a tight nexus because modus operandi evidence poses a high risk of unfair prejudice in that it allows the jury to learn about prior or subsequent bad acts of the defendant that are similar in nature

to the crime charged.  The commonalities among the crimes, therefore, need to be so distinctive that their probative value in identifying the defendant as the perpetrator of the crime charged outweighs the substantial risk of unfair prejudice.

We do not suggest that the anatomical drawings found in the defendant's apartment are admissible as modus operandi evidence. The method or location of the amputations shown in the drawings in the defendant's apartment are not so similar to the method or location of the actual dismemberment of the victims as to permit a finding that the drawings demonstrate the method of operation of the dismemberment.  See Crayton, 470 Mass. at 251 (pornographic drawings found in defendant's jail cell not admissible as evidence of modus operandi "where the drawings had only a general similarity to the child pornography" found on public library computer he was charged with having possessed).

Rather, the anatomical drawings are admissible as a different species of identity evidence:  evidence of idiosyncratic conduct by a defendant that, in light of the specific evidence in a case, tends to identify the defendant as the perpetrator of a crime.  Generally, the probative weight of such identity evidence need not be as great as modus operandi evidence because it does not involve the commission of similar crimes, and therefore poses less risk of unfair prejudice (although we do not minimize the risk of such prejudice arising

from the drawings in this case).  The probative weight of this type of identity evidence depends on its connection to the other evidence in the case that ties the idiosyncratic conduct to the identity of the perpetrator, as in our medieval weaponry example.[9]  Here, the anatomical drawings would not be admissible as identity evidence if Hall had not identified the third assailant as someone who enjoyed "cutting [the victims] up." The drawings have probative weight as to identity only because the drawings tend to identify the defendant as a person well known to Hall who appeared to have an unusual interest in the amputation and dissection of the human body.

Apart from identity, a second relevant, noncharacter purpose for admitting the drawings is to show state of mind. One of the extraordinary features of these killings is the dismemberment of the victims, which appears to have had no

---

[9] In dissent, Justice Lowy argues that our decision to admit the anatomical drawings is improper because "the connection between the defendant's other conduct and the charged conduct is squarely based on an impermissible propensity inference."  Post at    .  While the admission of any evidence that suggests the defendant's bad character risks inviting the jury to draw the improper inference that the defendant acted in conformity with his past conduct, the admission of the drawings in this case is not premised on such an improper inference.  Rather, the drawings invite the jury to conclude that the defendant matched Hall's description of the third participant in the crime.  While it would be improper to admit the drawings for the purpose of demonstrating that the defendant was predisposed to commit the crime, there is nothing improper about asking the jury to infer that the uncommon trait Hall attributed to the crime's third participant is also attributable to the defendant.

pragmatic purpose and which must have taken a considerable amount of time to complete, especially in the midst of a tropical storm. The collage and drawings in the defendant's apartment are probative of the defendant's state of mind as a person fascinated by amputation and human dissection, and of an intent to seize the opportunity of these killings to engage in actual amputations and human dissection. Cf. Commonwealth v. Howard, 469 Mass. 721, 739-740 (2014) (confrontations between defendant and victim three months prior to workplace shooting and between defendant and another employee were relevant to defendant's motive and state of mind).

Third, the motive for the killings was to silence Glasser, who would have testified against Hall in two criminal cases, and to silence the other two victims, who would otherwise have been witnesses to Glasser's killing. But these motives do not explain the victims' dismemberment. We have admitted other act evidence where, without it, a crime may appear to be an inexplicable act of violence. See Commonwealth v. Marrero, 427 Mass. 65, 68 (1998); Drew, 397 Mass. at 78-79. The defendant's apparent fascination with amputation and human dismemberment offers an explanation for what would otherwise be inexplicable.

Where there were three relevant, noncharacter purposes for the admission of the anatomical drawings, the judge did not abuse his discretion in ruling that, "[i]n light of the other

evidence in the case, I do believe they have some probative value which outweighs the prejudicial effect."  In Commonwealth v. Guy, 454 Mass. 440, 443-444 (2009), we concluded that the trial judge did not abuse his discretion where the probative weight of the evidence was less compelling than it was here, and where the risk of unfair prejudice was equally significant. Where an apparently randomly chosen victim was murdered in a park by stabbing, strangulation, and blunt trauma, we found no abuse of discretion in the admission of evidence that the defendant "spoke to coworkers about serial killings, and that he often read books about murder and serial killings" (footnote omitted).  Id. at 441, 443.  We concluded that evidence of the defendant's fascination with murder "was relevant to the defendant's motive and state of mind and to explain what otherwise might be seen as an inexplicable act of violence." Id. at 443.  We reach a comparable conclusion as to the anatomical drawings in this case.

Our analysis is different with respect to the admission of the photographs depicting the cutting objects found in the defendant's apartment.  "A weapon that could have been used in the course of a crime is admissible, in the judge's discretion, even without direct proof that the particular weapon was in fact used in the commission of the crime," because "[s]uch evidence is relevant for demonstrating that the defendant had the 'means

of committing the crime.'"  Commonwealth v. Barbosa, 463 Mass. 116, 122 (2012), quoting Commonwealth v. Ashman, 430 Mass. 736, 744 (2000).  Based on the testimony of the medical examiner and forensic anthropologist, the machete, cleaver, hatchets, and various knives found in the defendant's apartment were consistent with the types of tools used to dismember the victims, and could have served as the means to accomplish the dismemberment.  Although they tested negative for blood at the time of the search of the defendant's apartment on September 12, approximately two weeks after the killings, and therefore were not seized for further testing, they could not reasonably be excluded as weapons that were used in the commission of the dismemberment.  Therefore, we conclude that the judge did not abuse his discretion in admitting the photographs of the machete, cleaver, hatchets, and knives.

In contrast, the judge did abuse his discretion in admitting the spiked baseball bat, which had no probative value and posed a needless risk of unfair prejudice.  "Where a weapon definitively could not have been used in the commission of the crime, we have generally cautioned against admission of evidence related to it."  Barbosa, 463 Mass. at 122, citing Commonwealth v. Toro, 395 Mass. 354, 357-358 (1985).  Because there was no evidence that the baseball bat with spikes could have been used in the commission of the killings or the dismemberments, we

conclude that the judge erred in admitting the photograph depicting it. We also conclude that, given the other admissible evidence depicting what was found in the search of the defendant's apartment, the error was not prejudicial. Commonwealth v. Graham, 431 Mass. 282, 288, cert. denied, 531 U.S. 1020 (2000), quoting Commonwealth v. Flebotte, 417 Mass. 348, 353 (1994) (error not prejudicial "if we are sure that the error did not influence the jury, or had but very slight effect").

We note that the defendant, although he unsuccessfully moved in limine to exclude this other act evidence and timely objected to its admission, did not seek a limiting instruction regarding the jury's consideration of this evidence, and the judge did not give one. As a result, the jury were not told that this evidence may not be considered by them as evidence of the defendant's bad character or his propensity to commit the crimes charged.[10] See Massachusetts Superior Court Criminal Practice Jury Instructions §§ 7.7.2, 7.7.3 (Mass. Cont. Legal Educ. 2013). Because there was no motion for a new trial, we do not know whether the absence of a request for a limiting instruction arose from a tactical choice by defense counsel not to focus the jury's attention on this evidence, or from an error

---

[10] The judge did instruct the jury that the defendant's affiliation with the Hells Angels may not be considered as evidence of a bad character or a criminal personality.

of judgment by counsel.  Regardless, we review the absence of such a limiting instruction under G. L. c. 278, § 33E, to determine whether it created a substantial likelihood of a miscarriage of justice.  See Commonwealth v. Sullivan, 436 Mass. 799, 809 (2002) (substantial likelihood of miscarriage of justice standard applied to absence of limiting instruction in case of murder in first degree).  See also Commonwealth v. Roberts, 433 Mass. 45, 48, 61 (2000).

The jury are always free to consider evidence without limitation whenever a judge fails to give a limiting instruction under Mass. G. Evid. § 404(b), but we do not always conclude that the absence of such an instruction creates a substantial likelihood of a miscarriage of justice.  See Commonwealth v. Morgan, 460 Mass. 277, 290 (2011).  One factor in considering whether its absence produced a substantial likelihood of a miscarriage of justice is whether the prosecutor in his or her closing argument misused the other act evidence to invite the jury to consider it as proof of the defendant's bad character or propensity to commit the crime.  Cf. Commonwealth v. McCowen, 458 Mass. 461, 479-480 (2010) (prior bad act evidence not mentioned in prosecutor's closing argument).  In Guy, 454 Mass. at 443-444, we noted that "[t]he prosecutor elicited the testimony and referred to it in his closing in a technical, analytical manner, without drama or undue emphasis that might

have released its potential for unfair prejudice."  The same could be said here; the prosecutor did not speak of this testimony in his closing argument, and alluded to it only when he argued that the murders were not just an attempt to keep three men from testifying in court "but of satisfying some retribution and intent to take apart humanity piece by piece. . . .  [T]he defendant, quote, really enjoyed torturing and cutting them up."  In short, the prosecutor alluded to this evidence for its relevant, noncharacter purposes.  Where those purposes were themselves compelling, the absence of a limiting instruction did not create a substantial likelihood of a miscarriage of justice.

3.  <u>Statement by defendant regarding scars on his right arm</u>.  Hinman testified that, on an unspecified date, Hall brought the defendant to Hinman's property, and Hinman stared at the scars on the defendant's right arm.  Over objection, Hinman testified that the defendant told him, "See these scars[;] imagine what I can do to somebody else."  The defendant contends that the judge abused his discretion in determining that the probative weight of this statement outweighed the risk of unfair prejudice, and consequently admitting it in evidence.

We recognize that this statement generally would be relevant only for the forbidden purpose of suggesting the defendant's violent character and his propensity to commit acts

of violence, and therefore would be inadmissible. But in the unusual context of this case, it, like the collage of human dissections on the defendant's apartment wall, is relevant to identify the defendant as the third person participating in the killings who Hall described as someone who "really enjoyed torturing and cutting [the victims] up." In essence, through this statement, the defendant was describing himself as someone who is capable of extraordinary acts of violence against other persons, which tends to identify him as someone who would enjoy torturing and dismembering other persons, and which therefore permits the inference that he is the third person referred to by Hall in speaking with Casey. Where this statement is probative of the defendant's identification as the third assailant, we conclude that the judge did not abuse his discretion in concluding that its probative weight outweighed the risk of unfair prejudice.

4. Prosecutor's closing argument. The defendant contends that the prosecutor in closing argument "argued a number of points based on facts that do not appear in the record." Where there was no objection to the closing argument, we review the record to determine whether there was a substantial likelihood of a miscarriage of justice. We conclude that there was not.

The defendant identifies four instances where the prosecutor allegedly argued facts not in evidence. First, he

claims that there was no evidence supporting the prosecutor's statement that the three assailants had "the instruments in bags available for the dismemberment," which the prosecutor argued showed that the killings and dismemberments were planned. The defendant is correct that no witness testified to this fact, but the prosecutor is entitled to argue that it was a fair inference that the assailants had the tools with them when they killed the victims, even though it was also possible that they retrieved the tools after the killings based on Hall's statement that they left the scene believing that the black man was dead and were surprised to find him still alive when they returned.

Second, the defendant claims that the prosecutor improperly suggested that the cleaver found in the defendant's apartment was used to dismember the bodies. The prosecutor properly noted that the three assailants had access to the types of tools that could have been used to dismember the victims, including the cleaver. He also properly argued that the jury should not infer that the cleaver was <u>not</u> used in the killings because it did not test positive for blood, asking rhetorically, "Wouldn't you expect that [the cleaver] would test positive unless it was very carefully cleaned . . . ?" Where a kitchen cleaver would routinely be used to cut meat, and therefore would be expected to have blood residue if not carefully cleaned, this was not an improper argument.

Third, the defendant takes issue with the prosecutor's suggestion to the jury that the defendant was the third assailant whom Hall said "really enjoyed torturing and cutting them up." This was fair argument based on inferences from the evidence in the case.

Finally, the defendant claims that the prosecutor misstated the evidence by telling the jury that the defendant had "boasted to Steve Hinman that he had scarred himself." This was a fair inference from the defendant's statement to Hinman in which he invited Hinman to imagine what he could do "to somebody else."

5. Review under G. L. c. 278, § 33E. As part of our plenary review of the case, we note that the judge, in defining reasonable doubt in his final jury instructions, told the jury that "the evidence must convince you of the defendant's guilt to a reasonable and moral certainty," but omitted the phrase from the reasonable doubt instruction in Commonwealth v. Webster, 5 Cush. 295, 320 (1850), that clarified the meaning of that phrase: "a certainty that convinces and directs the understanding, and satisfies the reason and judgment, of those who are bound to act conscientiously upon it." Because the defendant did not object, we review to determine whether the judge's deviation created a substantial likelihood of a miscarriage of justice. See Commonwealth v. Figueroa, 468 Mass. 204, 220 (2014).

"A constitutionally deficient reasonable doubt instruction amounts to a structural error which defies analysis by harmless error standards."  Commonwealth v. Russell, 470 Mass. 464, 468 (2015), quoting Commonwealth v. Pinckney, 419 Mass. 341, 342 (1995).  But "[t]he Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof."  Russell, supra, quoting Pinckney, supra.  It suffices that the words used "impress[] upon the factfinder the need to reach a subjective state of near certitude of the guilt of the accused."  Russell, supra, quoting Pinckney, supra at 344.[11]

The phrase "moral certainty" if used "in isolation, without further explanation, might amount to an erroneous instruction on reasonable doubt."  Pinckney, supra at 345, citing Commonwealth v. Gagliardi, 418 Mass. 562, 571 (1994), cert. denied, 513 U.S. 1091 (1995).  But its use was not reversible error "where it was used with an additional instruction which impressed upon the factfinder the need to reach a subjective state of near certitude of the guilt of the accused."  Pinckney, supra at 344, citing Victor v. Nebraska, 511 U.S. 1, 14-15 (1994).  Although

---

[11] In Commonwealth v. Russell, 470 Mass. 464, 477-478 (2015), we exercised "our inherent supervisory power to require a uniform instruction on proof beyond a reasonable doubt that uses more modern language, but preserves the power, efficacy, and essence of the Webster charge."  The trial in this case resulted in verdicts in 2014, before the new instruction was mandated.

the phrase must be linked with "language that lends content to the phrase," Pinckney, supra at 345, "[w]e have never held that 'moral certainty' must be immediately followed by content-lending language, only that it must be linked with such language" (emphasis in original). Commonwealth v. LaBriola, 430 Mass. 569, 573 (2000). Additionally, we have said that use of the phrase "abiding conviction" in conjunction with the moral certainty language "does much to alleviate any concerns that the phrase 'moral certainty' might be misunderstood in the abstract." Id. at 572-573, quoting Victor, 511 U.S. at 21. The judge's use of the phrase "abiding conviction" in conjunction with "moral certainty," coupled with his fidelity to the Webster instruction in every respect except for the noted omission, convinces us that the omission did not create a risk that the jury failed adequately to understand the reasonable doubt standard, and therefore did not create a substantial likelihood of a miscarriage of justice. See Commonwealth v. Beldotti, 409 Mass. 553, 562 (1991) (no error where moral certainty language used as part of Webster charge).

Having addressed this omission in the reasonable doubt instruction, we conclude that the verdicts of murder in the first degree are fully consonant with justice and we decline to exercise our authority under G. L. c. 278, § 33E, to order a new

trial or to direct the entry of verdicts of a lesser degree of guilt.

<u>Judgments affirmed</u>.

LOWY, J. (dissenting, with whom Lenk, J., joins).  I agree with the court that the evidence was legally sufficient to support the defendant's convictions.  Because I disagree with the court's analysis of the admission of photographs of items found in the defendant's apartment, however, I respectfully dissent.

Today, the court purports to announce a new brand of identity evidence, which involves the use of similar, but not distinctive, conduct of a defendant to infer that the defendant acted in conformity with that conduct on another occasion.  If this sounds like the language often used to describe the type of character inference that fact finders are roundly prohibited from making, that is because it is.

The court sets forth three "relevant, noncharacter purposes" for which it holds the photographs were admissible: (1) identity, (2) state of mind, and (3) motive.  I address each in turn, and finally, I assess the prejudicial effect in this case.

1.  Identity evidence.  I agree with the court that the posters hanging in the defendant's apartment were not sufficiently similar to the methods by which the victims' bodies were dismembered to qualify as modus operandi evidence.[1]  I also

_____

[1] When asked whether the dismemberment of the victims was consistent with the surgical illustrations, the Commonwealth's

agree that evidence may be admissible to prove a defendant's identity, absent such similarity, when the evidence is ultimately relevant because the evidence makes it more likely than it would be without the evidence that the defendant is the individual responsible for the crime.  This latter category of "identity" evidence, however, does not permit the use of the defendant's conduct "to prove [his] character in order to show that on a particular occasion [he] acted in accordance with the character."  Mass G. Evid. § 404(b)(1) (2017).  This rule limiting the use of a defendant's prior conduct applies without regard to the probative strength of the conduct.

"One of the oldest principles of Anglo-American law is that a person 'should not be judged strenuously by reference to the awesome spectre of his past'" (citation omitted).  D.P. Leonard, The New Wigmore:  A Treatise on Evidence § 1.2, at 2 (2009)

---

expert said, "They do show amputation of limbs, so that portion is consistent.  I can't say if the exact location on the bone is consistent in some of them.  I can see at least one is inconsistent in terms of location.  Sometimes I just can't tell what part of the bone I'm looking at."  The prosecutor then asked whether the victims' limbs were dismembered at the site of the joint (as depicted in the illustrations), the witness responded, "They were chopped through sometimes near a joint but they were chopped through mostly right to the bone itself.  In terms of the vertebrae, a lot of the chopping was aimed between two bones, so both bones were damaged but they were separated where they normally separate."  Further, on cross-examination, defense counsel asked, "There's nothing in that diagram that's consistent with the multiple large chopping injuries which you just discussed, correct?"  The witness answered, "That's correct."

(Wigmore).  "For nearly two centuries, courts have excluded the evidence not because of its lack of probative value but primarily because of the dangers it is thought to present.  Most commonly cited is the danger of unfair prejudice."  Id. at 6.  This prohibition on character evidence includes using a defendant's other, relevant conduct to prove his or her "propensity" to commit the charged crime.  Id. at 2-3.  See Mass. G. Evid. § 404(b).  The danger of admitting such character evidence against the defendant is not that it is irrelevant.  Rather, the danger is that the jury will overvalue the evidence.  Wigmore, supra at 5-7.

To say that other conduct is permissibly probative of "identity," rather than impermissibly probative of character, merely because a defendant's character makes him more likely to be guilty, is an exercise in circular logic that renders the prohibition on the character inference inert.  Thus, the court's reasoning today, at best, dilutes the stringent requirements for modus operandi evidence, or, at worst, eviscerates the rule prohibiting use of a defendant's other conduct to show his propensity to commit the crime charged.

I would classify admissible evidence that is probative of identity into two categories:  (1) modus operandi, and (2) what I will call "identity-based evidence."  Unlike modus operandi, identity-based evidence does not require a high level of

distinctiveness shared between the defendant's other conduct and the charged conduct.[2]  Rather, such other conduct constitutes admissible identity-based evidence when introduced for a nonpropensity purpose, such as, motive, opportunity, knowledge, state of mind, or many other purposes, but the nonpropensity purpose is ultimately relevant to "identify" the defendant as the individual who committed the charged crime.  See P.C. Giannelli, Understanding Evidence 174-175 (4th ed. 2013) (Giannelli).

The following example of identity-based evidence is illustrative.  If shortly before committing armed robbery, a defendant steals a particular weapon to commit the armed robbery, evidence that the defendant stole the weapon would be admissible to establish that he had the means or opportunity -- because he had the particular weapon used to commit the crime.  See Giannelli, supra at 174.  That the defendant had the means to commit the crime is relevant to his "identity" as the perpetrator of the armed robbery.  See id.  The judge, however, must still balance the probative value of the theft of the weapon against the danger of undue prejudice that the jury will

---

[2] As the court notes, ante at    , a similarity that is merely general is a reason to exclude evidence of other conduct. The danger that a jury will consider prior conduct as propensity evidence is at its apex when the prior conduct resembles the charged conduct, but is not sufficiently similar for purposes of modus operandi.

consider the theft as evidence of bad character.  See Mass. G. Evid. § 403.  Yet, there is minimal danger that a jury would impermissibly consider the theft as indicative of the defendant's propensity to commit armed robbery, i.e., that the defendant showed his bad character by stealing a firearm, and that it was more likely that he committed the crime due to this bad character.  Rather, the more probable and logical inference is that the evidence "identifies" the defendant as the individual who committed the crime because he possessed the weapon used in its commission.  The latter conclusion is not based on an impermissible propensity inference.

In this case, the connection between the defendant's other conduct and the charged conduct is squarely based on an impermissible propensity inference.  The other conduct is hanging posters depicting medical amputations.  The charged conduct is chopping up three human beings.  The logical connection between the two is that the defendant acted in conformity with the character trait demonstrated by displaying images of amputation by brutally chopping up the victims on a subsequent occasion -- a stark contrast to the firearm example above, which involves no such impermissible character inference.

The court conditions the admissibility of the drawings on Adam Lee Hall's statement that "one of the guys really enjoyed" chopping the victims up.  The court says that the anatomical

drawings are thus probative of identity in the same way that posters of medieval weapons would be admissible identity evidence if Hall had said one of the participants was fascinated by medieval weapons.

The court's example is not analogous to the present case. Unlike the present case, the court's example does not implicate a propensity inference, because the medieval weapons referred to in the hypothetical example do not relate to the commission of the crime. Thus, the example does not ask the jury to conclude that, because the defendant had posters of medieval weapons, he is the type of person who would participate in three brutal murders. In the hypothetical example, Hall's statement serves only to identify a person who has an interest in medieval weapons. The medieval weapons posters are relevant because they show an interest of the accused, and the hypothetical statement identifies an individual who has that interest as a participant in the crime. The posters in no way suggest that the defendant acted in accordance with that interest in killing the victims.

By contrast, in this case Hall stated that one of the participants enjoyed the act of torturing and chopping up people. The anatomical drawings only corroborate this statement if one presumes that the defendant acted in accordance with his interest in anatomical dismemberment on a subsequent occasion by chopping up the victims in a manner that did not meaningfully

resemble the dissections depicted in the drawings. Regardless of whether the defendant's display of the posters makes it more likely that he was the third participant than it would be without such evidence, this is the quintessential, impermissible propensity inference.

2. <u>State of mind</u>. The court concludes that the fact that the dismemberment of the victims "appears to have had no pragmatic purpose and . . . must have taken a considerable amount of time to complete" was an indication of the defendant's state of mind. <u>Ante</u> at   . Even setting aside the evidence suggesting that there was in fact a pragmatic purpose for dismembering the bodies,[3] this evidence still requires a jury to assume that an individual who is "fascinated by amputation and human dissection," demonstrated only by display of posters, would "seize the opportunity of these killings to engage in actual amputations and human dissection." See <u>ante</u> at   .

---

[3] The court concludes that the dismembered bodies were likely all placed in Hall's Buick. <u>Ante</u> at   . Further, after the killings, Rose Dawson and Alexandra Ely, who were not alleged participants in the killings, drove in the Buick to a supermarket. They did not look in the trunk, but they also did not testify that they saw any blood or body parts in the cabin of the automobile. Moreover, David Casey testified that he later observed Hall open the trunk of the Buick and drop a number of plastic garbage bags into the hole Casey had dug. Accordingly, chopping up the bodies may well have been a practical measure for purposes of transporting three bodies in the trunk of the vehicle, while still retaining the vehicle for limited use until the time it could be destroyed. Whether the dismemberment of the bodies had any practical purpose was not an issue at trial and was not argued by the Commonwealth on appeal.

Under this rubric, the court's theoretical path of admissibility is "identity-based" evidence: a person who is fascinated with amputation is more likely to engage in the act of physically dismembering people. The court may be correct that displaying the posters is probative of the defendant's state of mind, which ultimately is relevant to identify him as the perpetrator of the crime. But, we do not allow in evidence simply because it is relevant. See Wigmore, supra at 5. This theory still requires the quintessential prohibited inference, although labeled as "state of mind," in this application. To be relevant to the defendant's state of mind, one must conclude that he acted in conformity with his other conduct of hanging the posters on a subsequent occasion by participating in the murders.

The Commonwealth itself described the state of mind only as "depraved." This is a thin veil. It is difficult to imagine an interpretation of this argument that is not a bald assertion that the defendant's bad or "depraved" character makes him more likely to be guilty of murder. See Commonwealth v. Crayton, 470 Mass. 228, 251-252 (2014) (jury prohibited from inferring that defendant's interest in child pornography meant he must have been person who accessed child pornography in library). Admitting the photographs as "state of mind" evidence where the photographs reflect only a general character trait of the

defendant eviscerates any distinction between evidence of a character trait and that of state of mind.

The admission of this evidence was coupled with testimony from one witness that she observed "a lot of creepy shit everywhere" inside the defendant's apartment.  On this theory of admissibility, the Commonwealth does not attempt to factually or temporally tie this so-called "state of mind" evidence to the crime at issue.  Contrast Commonwealth v. Drew, 397 Mass. 65, 78-79 (1986), S.C., 447 Mass. 635 (2006),  (defendant's participation in Satanic rituals relevant to prove involvement in ritualistic killings).  Accordingly, I would conclude that the posters were not admissible to prove the defendant's state of mind.

3.  Motive.  The court concludes that the posters were independently probative of the defendant's "motive."  The court relies on cases in which we have allowed the Commonwealth to establish a "context for the killing" when it would otherwise appear to the jury as an "inexplicable act of violence" (citation omitted).  Commonwealth v. Marrero, 427 Mass. 65, 68 (1998).  The circumstances of this case do not resemble those relied on by the court.  See, e.g., id. (Commonwealth allowed to introduce significant detail regarding defendant's relationship with victim and witnesses involved in drug business connected to murder); Commonwealth v. Bradshaw, 385 Mass. 244, 269-270 (1982)

(Commonwealth permitted to introduce evidence of defendant's activities on day of murder because they were "inextricably intertwined with the description of events on the [day] of the killing"). See also Commonwealth v. Guy, 454 Mass. 440, 443 (2009) (Commonwealth permitted to admit evidence of defendant's fascination with serial killings in absence of any other evidence of motive).

The court relies primarily on Guy, 454 Mass. at 443-444, which is not analogous. In that case, the Commonwealth had significant physical evidence tying the defendant to the crime, but was faced with a peculiar situation of having no explanation for the jury as to why the defendant had committed the crime.[4] By contrast, Hall orchestrated David Glasser's death to prevent his testimony. The other two victims were murdered to eliminate witnesses to Glasser's killing. The defendant, as the Commonwealth argued at trial, was motivated to assist Hall because the defendant was aspiring to become a member of the Hells Angels motorcycle club. The Commonwealth did not, and

---

[4] There was also a greater quantum of evidence that the defendant in Guy, 454 Mass. at 443-444 & n.3, had a significant fascination with serial killings, including a large number of books seized from his home (which were not themselves admitted in evidence, but were referenced) and testimony from his coworkers attesting to his ongoing fascination. Here, the only evidence of the defendant's "fascination" was that he had placed posters on his wall, and the record suggests that the posters had not been displayed on the wall for a long period of time because the defendant was still in the process of moving his belongings from his previous residence into this residence.

does not on appeal, argue that the defendant was motivated to participate in the crime to seize the opportunity to dismember human beings, or that the dismemberment had no practical purpose.

4. Prejudicial effect. For the reasons set forth above, I would conclude that the anatomical drawings were probative only of the defendant's character and were thus inadmissible. Accordingly, it is unnecessary to weigh the probative value against the danger of undue prejudice, since this evidence has no probative value other than propensity. Instead, the relevant inquiry is whether the error created a "reasonable possibility that . . . might have contributed to the jury's verdict." Commonwealth v. Alphas, 430 Mass. 8, 23 (1999). The Commonwealth bears not only the burden to show the lack of error, but also the "risk of doubt when any exists" as to whether the error influenced the jury's verdict. Id. The Commonwealth does not even argue that the evidence, if erroneously admitted, was not prejudicial. That may well end the inquiry, but there are five factors that I believe enhanced the danger of prejudice in this case.

First, even if the evidence had been admissible, it should have been accompanied by a limiting instruction. No limiting instruction was requested or given at trial, despite the palpable danger of undue prejudice of the evidence. Without a

limiting instruction, the photographs were before the jury for all purposes, including as impermissible propensity evidence. This danger created a substantial likelihood of a miscarriage of justice. G. L. c. 278, § 33E. See Crayton, 470 Mass. at 252 (illustrations too prejudicial to justify admission, even with limiting instruction).

Second, in other cases, we have found that the failure to give a limiting instruction did not warrant reversal, when other circumstances mitigated the danger of unfair prejudice. For example, in Guy, 454 Mass. at 443-444 & n.3, in which we did not discuss a limiting instruction, we noted that the prosecutor utilized evidence of the defendant's interest in books about serial killings -- which were not admitted in evidence -- in a "technical, analytical manner, without drama or undue emphasis that might have released its potential for unfair prejudice." Further, the prosecution in that case had compelling physical evidence connecting the defendant to the crime, reducing the probability that the jury would return a guilty verdict based on the defendant's macabre interest.

This case is distinguishable from Guy. Unlike the books in Guy, the posters themselves, depicting graphic images, were admitted in evidence. Also, the prosecutor was not especially cautious in avoiding drama or character-related implications in his closing argument, to mitigate the danger of unfair

prejudice.  Rather, the prosecutor made a graphic emotional appeal to the jury, referring to the defendant's intent "not just . . . to keep three men from testifying in court but of satisfying some retribution and intent to take apart humanity piece by piece."  The court concludes that this statement, clearly referring to the horrendous nature of the dismemberment and not any pertinent evidentiary point, is comparably "technical and analytic."  I disagree.

Third, although the prosecutor did not explicitly refer to the photographs in his closing argument, defense counsel quite understandably addressed the evidence in his closing argument three times, in an effort to dampen its prejudicial force.

Fourth, the judge gave proper limiting instructions regarding the defendant's association with the Hells Angels and Hall's history with Glasser.  By informing the jury that there was specific evidence that they should not consider as evidence of bad character, the jury were left to infer that the remainder of the evidence could be considered as evidence of the defendant's bad character.

Finally, the likelihood that the jury considered the evidence for a prohibited purpose was further enhanced by the entirely circumstantial nature of the case against the

defendant.[5] As in <u>Crayton</u>, 470 Mass. at 250, the primary issue at trial was the defendant's identity. Due to the lack of direct evidence and a limiting instruction, the jury were more apt to use the photographs as character evidence to infer the defendant's guilt. Contrast <u>Guy</u>, 454 Mass. at 442-444, 447 (evidence of defendant's interest in serial killings used to establish his identity as killer, but also deoxyribonucleic acid evidence matched defendant). Even with the impermissible character evidence, the issues were difficult enough to resolve that the jury deliberated nearly five full days before reaching verdicts.

I believe that the Commonwealth did not satisfy its burden to demonstrate that there was no "reasonable possibility" that the erroneous admission of these photographs contributed to the jury's verdicts. Accordingly, I would have reversed the defendant's convictions and granted a new trial.

---

[5] Of course, the Commonwealth is entitled to prove its case entirely by circumstantial evidence. <u>Commonwealth</u> v. <u>Woods</u>, 466 Mass. 707, 713, cert. denied, 134 S. Ct. 2855 (2014).