NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12420


COMMONWEALTH  vs.  ROBERT L. HONSCH.



Hampden.     October 6, 2023. - January 30, 2024.

Present:  Budd, C.J., Gaziano, Lowy, Cypher, & Wendlandt, JJ.[1]


Homicide.  Evidence, Consciousness of guilt, Identity, Prior
    misconduct, Subsequent misconduct, Relevancy and
    materiality, Inflammatory evidence, Photograph,
    Fingerprints, Expert opinion, Qualification of expert
    witness, Third-party culprit, Voluntariness of statement,
    Hearsay.  Constitutional Law, Confrontation of witnesses.
    Witness, Expert.  Jury and Jurors.  Practice, Criminal,
    Capital case, Confrontation of witnesses, Assistance of
    counsel, Voluntariness of statement, Transcript of
    evidence, Hearsay, Redaction, Argument by prosecutor,
    Instructions to jury, Jury and jurors, Conduct of juror.




    Indictment found and returned in the Superior Court
Department on September 11, 2014.

    The case was tried before Constance M. Sweeney, J.


    Neil L. Fishman for the defendant.
    Travis H. Lynch, Assistant District Attorney, for the
Commonwealth.


_____

    [1] Justice Cypher participated in the deliberation on this
case prior to her retirement.

LOWY, J.  In 1995, the bodies of the defendant's wife and daughter were found in secluded locations in Massachusetts and Connecticut, respectively.  More than twenty years later, the defendant was convicted in Massachusetts of murder in the first degree for the killing of his wife.

In this direct appeal from his conviction, the defendant contends that (1) there was insufficient evidence to establish identity and deliberate premeditation; (2) the evidence of his daughter's murder was erroneously allowed in evidence; (3) the testimony of two latent print examiners was erroneously and unconstitutionally allowed in evidence; and (4) the defendant was unfairly precluded from demonstrating that there was a potential third-party culprit and that police failed to adequately investigate such a possibility.  The defendant lastly asks us to exercise our authority under G. L. c. 278, § 33E, to order a new trial or direct the entry of a verdict of a lesser degree of guilt.  We conclude that there was no reversible error with respect to any issue raised by the defendant and, after plenary review, no cause to exercise our powers under G. L. c. 278, § 33E.  We therefore affirm the defendant's conviction.

1.  Background.  We recite the facts a rational jury could have found, viewing the evidence in the light most favorable to the Commonwealth, reserving certain details for our analysis of the issues.

a.  The discovery of Marcia's and Elizabeth's bodies.[2]  On September 28, 1995, police officers discovered a female body behind a strip mall in New Britain, Connecticut.  Police identified this body in 2014 as that of Elizabeth.  Her body was inside two overlapping garbage bags, and both it and the garbage bags were wrapped in two overlapping sleeping bags.  The cause of death was later found to be a gunshot wound to the head, resulting from a medium to large caliber bullet, and Elizabeth had likely been killed only a few hours before her body was discovered.

On October 6, 1995, an individual camping in Tolland State Forest in Tolland discovered a different female body near the campsite's dump station.  Police identified this body in 2014 as that of Marcia.  The body was about nine feet down an embankment from a wooden guardrail.  One of the vertical portions of the guardrail had fresh damage from a projectile strike, and there was a large pool of blood in the paved area near the guardrail.  Investigators recovered several items near the body, including a discharged .45 caliber cartridge casing, a blue and green towel with three holes in it, and an empty package of cigarettes.  Based on the guardrail damage, the discharged casing found at the crime scene, and a bullet jacket discovered during the

---

[2] As the defendant, Marcia, and Elizabeth share a last name, we refer to Marcia and Elizabeth by their first names.

autopsy of the body, there was evidence of at least two gunshots, and possibly three, fired at Marcia. The decomposition of Marcia's body indicated that Marcia died between September 22, 1995, and October 2, 1995. The cause of death was a gunshot wound to the head, likely resulting from a medium to large caliber bullet.

b. The defendant's consciousness of guilt. In September 1995, the defendant was living with his wife, Marcia, and his teenage daughter, Elizabeth, in Brewster, New York. The defendant and his wife were previously separated, but they had recently reunited.

In late September 1995, the defendant visited one of Marcia's daughters from a previous marriage. The defendant would not make eye contact with her and appeared disheveled and stressed. He told the daughter that he had been given job offers in several countries, including England and Australia. Later during that visit, the defendant explained to the daughter that Marcia and Elizabeth had already moved to Australia. The defendant also visited Marcia's son-in-law -- married to another one of Marcia's daughters from the previous marriage -- at around the same time. The defendant told the son-in-law that he was moving to Australia and did not respond when the son-in-law inquired whether Marcia and Elizabeth knew about the planned move.

The defendant never applied for an Australian visa or visited Australia. Instead, on November 24, 1995, the defendant moved to Africa. He traveled throughout several countries in Africa for approximately four years and moved back to the United States during the summer of 1999. Shortly thereafter, in 2000, he remarried and changed his surname to his new wife's surname. He and his new wife lived in various States before ultimately settling down in Ohio.

Another one of Marcia's daughters discovered the defendant's location and, in November 2013, telephoned the defendant. The defendant stated during this conversation that Marcia left him in Australia for another man, and Elizabeth stayed with them.

In 2014, a relative of Marcia and Elizabeth filed a missing person's report for Marcia and Elizabeth with the New York State police. The officer working on the report connected the two unknown female bodies from 1995 to Marcia's and Elizabeth's disappearance during the same time frame. Marcia's and Elizabeth's family thereafter confirmed the identity of each victim: Elizabeth (Connecticut) and Marcia (Massachusetts).

Soon after Marcia and Elizabeth were identified, a Massachusetts State police trooper, along with officers from other jurisdictions, visited the defendant in Ohio. The State police trooper asked if the defendant would speak with him and a

Connecticut law enforcement officer, and the defendant invited them both into his house. The defendant told the State trooper that he had not seen Marcia or Elizabeth since 1995 and had moved to Africa some point after seeing Marcia and Elizabeth for the last time. Other than that, he claimed to have no memory as to what occurred in 1995.

Following this conversation, the State trooper took the defendant to the Wayne County sheriff's office in Ohio, provided the defendant with Miranda warnings, and again interviewed the defendant. The defendant continued to claim that he had no memory of what occurred in 1995. The defendant did admit, however, that the two sleeping bags found at Elizabeth's crime scene were his.

c. Forensic evidence. Following the defendant's interviews, law enforcement obtained additional analyses of evidence from both Marcia's and Elizabeth's crime scenes. The defendant's deoxyribonucleic acid (DNA) profile was found to be consistent with the DNA profile from sperm cells detected inside Marcia's body. Additionally, the defendant was not able to be excluded as the source of the hair taken from Elizabeth's crime scene, but he was excluded as a possible contributor to a mixture of DNA recovered from Elizabeth's fingernail scrapings, the sperm obtained from her underwear, and three DNA profiles obtained from the garbage bags covering Elizabeth. Lastly, two

latent print examiners, Sarah K. Pivovar and Christopher M. Dolan, opined that three palm prints on the garbage bags covering Elizabeth originated from the defendant.

d. The defendant's conviction and sentencing. The defendant was ultimately indicted in Massachusetts in connection with Marcia's death. There was no indictment in Massachusetts in connection with the killing of Elizabeth, whose body was found out of State. On June 12, 2017, following a jury trial, the defendant was convicted of murder in the first degree in connection with Marcia's death, based on the theory of deliberate premeditation. He was sentenced to life without the possibility of parole.

2. Discussion. a. Sufficiency of the evidence. At the close of the Commonwealth's case, the defendant moved for a required finding of not guilty, arguing that the evidence was insufficient to support a conviction of murder in the first degree. The trial judge denied the motion as to the murder charge under a theory of deliberate premeditation.[3] The defendant now reasserts the argument on appeal that the evidence presented by the Commonwealth was insufficient (i) to prove his

---

[3] The trial judge granted the defendant's motion as to the murder charge based on the theory of extreme atrocity or cruelty.

identity as Marcia's killer and (ii) to prove he killed Marcia with deliberate premeditation.

When we review the denial of a motion for a required finding of not guilty, we "consider whether, after viewing the evidence in the light most favorable to the Commonwealth, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Commonwealth v. MacCormack, 491 Mass. 848, 854 (2023). The jury may primarily or entirely rely on circumstantial evidence, and "the reasonable inferences drawn from such evidence 'need not be necessary or inescapable,' only 'reasonable and possible.'" Id., quoting Commonwealth v. Lao, 443 Mass. 770, 779 (2005), S.C., 450 Mass. 215 (2007) and 460 Mass. 12 (2011). A jury cannot convict based on "the piling of inference upon inference or on conjecture and speculation," however. MacCormack, supra.

In sum, we decide whether the evidence in its entirety was sufficient such that any rational jury could have found that the defendant was the perpetrator of the crime and committed the crime with deliberate premeditation. If the Commonwealth met this burden of production, then the evidence was properly admitted to the jury to make a fact-finding decision; we will not second guess the jury's ultimate conclusion. See Commonwealth v. Lake, 410 Mass. 47, 51 (1991) ("It is not the role of this court to second guess a jury on determinations of

fact").  Here, we conclude that the Commonwealth met its burden and thus decline to overturn the jury's findings.

i.  Identity.  The Commonwealth presented four categories of evidence demonstrating that the defendant was the perpetrator of Marcia's murder.  First, there was evidence that the defendant had the opportunity to commit the crime.  The defendant's sperm was found inside Marcia's body, and a jury could reasonably infer that the defendant was with Marcia at around the time of the murder.

Second, there was evidence, albeit limited evidence, tying the defendant to the crime scene.  The defendant was familiar with the campsite in which Marcia's body was found, considering he had camped in that specific State forest previously and had camped in the general area many times prior.  There was also a cigarette package found near the victim's body that the police traced back to upstate New York.  The defendant had smoked cigarettes at the time of the murder and lived in New York.

Third, there was the evidence of Elizabeth's murder.  As explained infra, a jury could permissibly infer based on the circumstances of both murders that (i) the same perpetrator killed both Elizabeth and Marcia, (ii) the defendant was the perpetrator of Elizabeth's murder, and therefore (iii) the defendant was the perpetrator of Marcia's murder.

Fourth, there was substantial evidence of consciousness of guilt. The defendant lied to Elizabeth's and Marcia's relatives about his wife's and daughter's whereabouts: first, in 1995, he stated that Elizabeth and Marcia had moved to Australia; and, second, in 2013, the defendant stated that Elizabeth and Marcia had left him after they all moved to Australia. Yet, there were no records of Elizabeth, Marcia, or the defendant ever having moved to Australia, and the defendant later admitted that he moved to Africa, not Australia. A jury could infer that the defendant made these false statements to conceal that the victims were missing. See Commonwealth v. Cassidy, 470 Mass. 201, 217 (2014) ("Evidence of . . . concealment, false statements to police, destruction or concealment of evidence, . . . or similar conduct generally is admissible as some evidence of consciousness of guilt").

The defendant also fled to Africa soon after the crime, and then changed his surname shortly after returning to the United States. A jury could infer that "a person who flees or hides after a criminal act has been committed does so because he feels guilt concerning that act." Commonwealth v. Toney, 385 Mass. 575, 584 (1982). See Cassidy, 470 Mass. at 217 ("Evidence of flight . . . generally is admissible as some evidence of consciousness of guilt"). Lastly, a jury could find that the defendant lied to police in 2014 when he claimed memory loss.

See Cassidy, supra; Commonwealth v. Porter, 384 Mass. 647, 653 (1981) ("Such intentionally false and misleading statements by the defendant [to police] could have been found to indicate a consciousness of guilt on his part").

The defendant correctly contends that "[b]y itself, evidence of actions suggesting consciousness of guilt is not sufficient to convict a defendant." See Commonwealth v. Morris, 465 Mass. 733, 738 (2013). But the consciousness of guilt evidence, together with reasonable and possible inferences based on the other three categories of evidence, "no one of which alone would be enough to convict the defendant, combine to form a fabric of proof that was sufficient to warrant the jury's finding beyond a reasonable doubt that the defendant was the person who killed the victim[]." Commonwealth v. Cordle, 404 Mass. 733, 741 (1989), S.C., 412 Mass. 172 (1992), quoting Commonwealth v. Rojas, 388 Mass. 626, 630 (1983).

ii. Deliberate premeditation. The defendant also argues that there was insufficient evidence to support a finding that he killed Marcia with deliberate premeditation. We disagree.

"To establish that a defendant acted with deliberate premeditation, the Commonwealth must show that 'the plan to kill was formed after deliberation and reflection.'" Commonwealth v. Tejada, 484 Mass. 1, 6, cert. denied, 141 S. Ct. 441 (2020), quoting Commonwealth v. Johnson, 435 Mass. 113, 118-119 (2001),

S.C., 486 Mass. 51 (2020).  "No particular length of time of reflection is required to find deliberate premeditation; a decision to kill may be formed in a few seconds."  Commonwealth v. Whitaker, 460 Mass. 409, 419 (2011).  A jury may infer deliberate premeditation "from the nature and extent of a victim's injuries, the duration of the attack, the number of blows, and the use of various weapons."  Id.

Here, there was evidence that the defendant shot Marcia through a towel.[4]  While the Commonwealth argues a jury could infer that the defendant used the towel to muffle the sound of the gunshot, the defendant argues such an inference is speculative.  Regardless of how the towel was used, the important point is that the defendant chose to use the towel for some role in the killing, thereby demonstrating at least a moment of planning and reflection.  Moreover, the defendant shot at Marcia at least twice, possibly three times, including a fatal gunshot to her head.  "[T]he jury could have inferred in these circumstances that the multiple shots fired at the victim were evidence of deliberate premeditation, even if only one shot killed the victim."  Commonwealth v. Coleman, 434 Mass. 165, 168 (2001).  See Commonwealth v. Good, 409 Mass. 612, 618 (1991)

---

[4] The towel with three holes in it tested positive for lead on one of the holes and showed visible smoky residue on two of them, as well as unburned gunpowder disks on the third.

(sufficient evidence to support finding of deliberate premeditation where "[t]hree bullets were fired" and "all struck the victim in vital areas, including the back of the head").

b. Evidence of Elizabeth's murder. Evidence of Elizabeth's murder was vital to the Commonwealth's case against the defendant for Marcia's murder. The defendant argues that evidence of Elizabeth's murder was improperly admitted and thus urges us to reverse his conviction. We review the trial judge's decision allowing the Commonwealth to introduce this evidence for an abuse of discretion. See Commonwealth v. Peno, 485 Mass. 378, 386 (2020).

Uncharged conduct is admissible only if it passes a two-pronged inquiry. Peno, 485 Mass. at 386. "First, the evidence must be relevant to something other than the defendant's propensity to commit the charged offense." Id. "Second, if the evidence is relevant, its prejudicial effect must not outweigh its probative value." Id. The trial judge did not abuse her discretion in determining that evidence of Elizabeth's murder satisfies these two criteria.

i. Nonpropensity purpose. "It is long established that evidence of uncharged criminal acts or other misbehavior is not admissible to show a defendant's bad character or propensity to commit the charged crime . . . ." Commonwealth v. Dwyer, 448 Mass. 122, 128 (2006). Such evidence may nonetheless "'be

admissible for another purpose,' such as to prove 'motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.'" Peno, 485 Mass. at 385, quoting Mass. G. Evid. § 404(b)(2) (2020). Here, the trial judge found that the evidence of Elizabeth's murder was relevant to establish the identity of the perpetrator of Marcia's murder. We agree.

We generally categorize admissible evidence of other acts of the defendant that are probative of identity as "modus operandi" evidence. Commonwealth v. Veiovis, 477 Mass. 472, 483 (2017). Modus operandi evidence requires "a uniqueness of technique, a distinctiveness, or a particularly distinguishing pattern of conduct common to the current and former incidents." Commonwealth v. Jackson, 417 Mass. 830, 836 (1994), quoting Commonwealth v. Brusgulis, 406 Mass. 501, 506 (1990). "It is not enough that there is some 'general, although less than unique or distinct, similarity between the incidents.'" Jackson, supra, quoting Brusgulis, supra at 507. Rather, it must be "so unusual and distinctive as to be like a signature." Jackson, supra, quoting Cordle, 404 Mass. at 747 (Liacos, J., dissenting).

Such evidence is relevant to prove identity because where the prior or subsequent crime and the charged crime have the same unique signatures, it is highly likely that both crimes

were perpetrated by the same individual.  See Commonwealth v. Magri, 462 Mass. 360, 364 n.6 (2012), quoting Black's Law Dictionary 1095 (9th ed. 2009) ("'Modus operandi' refers to 'a pattern of criminal behavior so distinctive that investigators attribute it to the work of the same person'").  Thus, if the Commonwealth can prove that a defendant committed the prior or subsequent crime with a unique signature, the logical inference is that the charged crime with the same unique signature was also committed by the defendant.

But modus operandi evidence is not the only type of admissible identity-based evidence.  See Veiovis, 477 Mass. at 483.  "[E]vidence may be admissible to prove a defendant's identity, absent such similarity, when the evidence is ultimately relevant because the evidence makes it more likely than it would be without the evidence that the defendant is the individual responsible for the crime."  Id. at 491 (Lowy, J., dissenting).

For example, in addition to two crimes sharing a unique technique or pattern of conduct, the totality of the circumstances of the prior or subsequent crime and charged crime can indicate that the crimes were perpetrated by the same individual.  As with modus operandi evidence, the Commonwealth may then argue that if a defendant committed the prior or

subsequent crime, the logical inference is that such a defendant also committed the charged crime.

The circumstances must strongly suggest that the two crimes are related and were perpetrated by the same individual.  Where the totality of the circumstances only slightly suggests this to be the case, "the risk is great that a jury will view the similar act as evidence of bad character or propensity rather than of identity."  Commonwealth v. Crayton, 470 Mass. 228, 251 (2014).  Thus, the Commonwealth must demonstrate that the possibility is quite remote that mere coincidence could explain the unique set of circumstances underlying the two crimes.  Cf. United States v. Miller, 959 F.2d 1535, 1539-1540 (11th Cir.), cert. denied, 506 U.S. 942 (1992) ("similarities between the two transactions provide strong evidence that the supplier in both transactions was the same person," because "the possibility is quite remote that [the buyer] had two different suppliers, both named 'Louis,' and both operating from a location approximately equidistant from [the buyer's] mother's house"); United States v. Woods, 484 F.2d 127, 135 (4th Cir. 1973), cert. denied, 415 U.S. 979 (1974) ("the remoteness of the possibility that so many infants in the care and custody of defendant would suffer cyanotic episodes and respiratory difficulties if they were not induced by the defendant's wrongdoing . . . would prove the identity of defendant as the wrongdoer").

The case of Commonwealth v. Gray, 465 Mass. 330, cert. denied, 571 U.S. 1014 (2013), demonstrates the type of unusual category of circumstances where this rule is applicable. There, the defendant was charged in connection with three discrete attacks: (i) the killing of one of his uncles, (ii) the assault and battery of another uncle, and (iii) the killing of the defendant's stepfather. Id. at 331. The defendant was convicted of the two crimes against his uncles, but the jury were unable to reach a verdict with respect to the charge involving the defendant's stepfather. Id. On appeal, the defendant argued that the trial on the one assault charge should have been severed from the trial on the two murder indictments. Id. at 334. We disagreed with the defendant, holding that joinder was proper. Id. at 337. As part of this analysis, we determined that "the similarities between the [assault] and the shootings were sufficiently distinctive" that they each would have been admissible at the other's respective, separate trial to prove identity. Id.

The technique used in all three assaults involved attacking the victims in their houses with a gun while the victims were likely kneeling. Gray, 465 Mass. at 336. Each technique was similar to the others, but not unusually distinctive. Cf. Brusgulis, 406 Mass. at 507 ("The features that are common to the incidents are common to numerous assaults on women . . .").

Nonetheless, the circumstances surrounding the technique were sufficiently similar to be probative of identity: "[t]he attacks occurred within a thirty-day period," and "[e]ach involved an attack on an older male member of the defendant's family whom the defendant believed had molested him as a child." Gray, supra.

The possibility that these three attacks were not perpetrated by the same individual -- considering that there was a similar method used, the attacks occurred within a short period of time, and the victims were all relatives of the defendant -- was quite remote. Accordingly, we determined that each crime would have been admissible to prove identity for the other crimes not just due to the general similarity of the technique used, but because these additional circumstances strongly suggested that the attacks were related. Gray, 465 Mass. at 336-337.

The circumstances of this case are analogous to those in Gray: the two crimes involved family members who were attacked within a short time frame and in similar circumstances. That is, a mother and daughter were murdered within the same week, both killed by gunshot wounds to the head and from medium to large caliber bullets. Their bodies were left without identification, in hidden areas, and in different States from each other and from New York, where they were both living at the

time.  The crime scenes in which their bodies were found were both camping-related:  Marcia was found at a campground, and Elizabeth was found within two sleeping bags.  While the possibility exists that it was mere coincidence for a mother and daughter to be murdered within such a short time frame and in such similar circumstances, that possibility is quite remote. Accordingly, evidence of Elizabeth's murder, while not enough alone to survive a motion for a required finding of not guilty, was relevant to prove that the same perpetrator killed both Elizabeth and Marcia.

For the Commonwealth to argue that this perpetrator was the defendant, specifically, the Commonwealth was required to show that the jury could reasonably conclude that the defendant committed Elizabeth's murder by a preponderance of the evidence. See Commonwealth v. Rosenthal, 432 Mass. 124, 126-127 (2000), citing Huddleston v. United States, 485 U.S. 681, 689 (1988). The Commonwealth met this burden:  the defendant's palm prints were found on the garbage bags in which Elizabeth's body was found, the defendant's hair was found in the same garbage bags, the defendant admitted that the sleeping bags in which Elizabeth's body was found were his, there was substantial consciousness of guilt evidence that related to Marcia and

Elizabeth, and there was the fact that Marcia was also killed.[5] There was sufficient evidence such that the jury could conclude by a preponderance of the evidence that the defendant killed Elizabeth.

Accordingly, the trial judge did not abuse her discretion in concluding that evidence showing that the defendant killed Elizabeth was relevant for the nonpropensity purpose of establishing the defendant's identity as Marcia's killer.

---

[5] We recognize that using Marcia's murder to find Elizabeth's murder to be admissible, only then to use Elizabeth's murder to find that there was sufficient evidence for a jury to find that the defendant committed Marcia's murder (see supra), at first glance, appears to be circular reasoning. But these are discrete legal inquiries, and our law envisions this form of reasoning. To have held that evidence of Elizabeth's murder was admissible, the trial judge must have "examine[d] all the evidence in the case," which included Marcia's murder. See Commonwealth v. Meola, 95 Mass. App. Ct. 303, 308 n.13 (2019), quoting Huddleston, 485 U.S. at 690. To determine that the evidence was sufficient for the jury to convict the defendant of murdering Marcia, we must consider "the evidence in its entirety," which includes evidence of Elizabeth's murder (citation omitted). See Commonwealth v. Mauricio, 477 Mass. 588, 597 (2017). The reasoning in each legal analysis is thus proper. See United States v. Young, 65 F. Supp. 2d 370, 373 n.8 (E.D. Va. 1999), citing Huddleston, supra at 691 ("To be sure, there is no way for a jury to conclude that the government's theory of [the uncharged crime] is true, and therefore relevant to their theory of [the charged crime], without concluding that the government's theory of [the charged crime] is correct -- which is, of course, exactly what the government seeks to prove in the first place. Nonetheless, Huddleston contemplates precisely this form of reasoning, and sensibly so because the jury will [themselves] consider the entire record in deciding the weight and effect of the evidence concerning [the uncharged crime]").

ii. Undue prejudice. Even if evidence is offered for a nonpropensity purpose, the evidence may still be inadmissible "if its probative value is outweighed by the risk of unfair prejudice to the defendant." Crayton, 470 Mass. at 249. At the outset, the trial judge "consistently provided limiting instructions at the time each witness testified and provided another instruction during the final charge," and we "presume that such instructions [were] understood by the jury and render[ed] any potentially prejudicial evidence harmless" (citation omitted). See Commonwealth v. Samia, 492 Mass. 135, 151 (2023).

The defendant's principal argument is that the evidence of Elizabeth's murder was unfairly prejudicial because it "overwhelmed" the Commonwealth's case. See Dwyer, 448 Mass. at 128-129. But the evidence of Elizabeth's murder was highly probative of the identity of the perpetrator of the charged crime, and the evidence therefore went to the heart of the Commonwealth's case. In light of the probativeness of the evidence and the trial judge's limiting instructions, we conclude that the trial judge did not abuse her discretion in allowing the Commonwealth to introduce evidence of Elizabeth's murder at trial. See Commonwealth v. Dorazio, 472 Mass. 535, 542 (2015) (prior bad act evidence admissible where trial judge "conclude[d] that the relevant and probative value of the

evidence . . . was very high and that the potential for undue prejudice could be minimized by a limiting instruction").

The defendant further contends that certain photographs of Elizabeth[6] were inflammatory and, therefore, even further unduly prejudicial. We do note that the photographs at issue were photographs relevant to an uncharged crime and thus had two layers of prejudice:  the "inherent[] prejudic[e]" of an uncharged crime (citation omitted), Crayton, 470 Mass. at 249 n.27, and the inflammatory nature of gruesome photographs.

Nonetheless, it is rare for this court to conclude that a trial judge abused his or her discretion by admitting relevant photographs of crime scenes and homicide victims.  See Commonwealth v. Barbosa, 457 Mass. 773, 803 (2010), cert. denied, 563 U.S. 990 (2011), quoting Commonwealth v. DeSouza, 428 Mass. 667, 670 (1999) ("This court has almost never ruled that it was error to admit photographs of crime scenes and homicide victims").  "That the photographs may be gruesome or have an inflammatory effect on the jury does not render them inadmissible so long as they possess evidentiary value on a material matter."  Commonwealth v. Reyes, 483 Mass. 65, 74 (2019), quoting Commonwealth v. Olsen, 452 Mass. 284, 294 (2008).  Contrast Commonwealth v. Walters, 485 Mass. 271, 282-

_____

[6] At oral argument, the defendant specifically referenced exhibit nos. 51, 70, 82, 83, 84, and 85.

283 (2020) (photograph of victim's "bulging left eye, after the body had been decomposing for six days," was inadmissible because it "was likely to be particularly inflammatory and had little probative value").

Here, the photographs at issue were probative of a material and central issue in the Commonwealth's case -- that Elizabeth was killed in the same manner as Marcia (i.e., with a gunshot wound to the head) and that the crime scenes were similar (i.e., the bodies were left in concealed locations and in camping-related circumstances), which was probative of the identity of the perpetrator. Accordingly, the two layers of prejudice did not outweigh the highly probative nature of these photographs.

The trial judge thus did not abuse her discretion in allowing the Commonwealth to introduce evidence that the defendant committed Elizabeth's murder, to show that Marcia's and Elizabeth's murders were perpetrated by the same individual and that the perpetrator of both crimes was the defendant.

c. Latent print evidence. After a pretrial, nonevidentiary hearing, the trial judge denied the defendant's motion to exclude testimony of two latent print examiners. The defendant on appeal reiterates that the experts' testimony should have been excluded and further argues that the trial judge erred by declining to hold an evidentiary hearing prior to making her determination. In addition, the defendant argues

that the testimony of one of the latent print examiners violated his constitutional right to confront witnesses against him and that both latent print examiners' testimony was improperly couched in the language of certainty. We address each of the defendant's arguments in turn, concluding that there was no reversible error.

i. Motion to exclude. A party seeking to offer expert testimony regarding scientific, technical, or other specialized knowledge must first "establish a sufficient foundation for a judge to determine whether the expert's opinion satisfies gatekeeper reliability." Commonwealth v. Davis, 487 Mass. 448, 453 (2021), S.C., 491 Mass. 1011 (2023). See Mass. G. Evid. § 104(a) (2023). In particular, a trial judge should only exclude expert testimony "[i]f the process or theory underlying [an] . . . expert's opinion lacks reliability." Davis, supra, quoting Commonwealth v. Patterson, 445 Mass. 626, 639 (2005). We review the trial judge's gatekeeper determination for an abuse of discretion. Davis, supra at 455.

Here, the two latent print examiners used the ACE-V[7] methodology, a methodology we have held to be reliable. See Commonwealth v. Joyner, 467 Mass. 176, 181 (2014) ("expert [latent print] testimony based on the ACE-V methodology

_____

[7] ACE-V stands for "analysis, comparison, evaluation, and verification."

continues to be admissible"); Commonwealth v. Gambora, 457 Mass. 715, 724-725 (2010) (although 2009 National Academy of Sciences report "raises a number of questions about the reliability of certain aspects of the ACE-V methodology and expert testimony based on it," report "does not conclude that [latent print] evidence is so unreliable that courts should no longer admit it"). As reliability of the methodology has already been established in our courts, the trial judge properly took judicial notice of the methodology's reliability. See Davis, 487 Mass. at 454-455.

The Commonwealth not only must show that the methodology is reliable, but also must show that the particular application of that process is reliable. See Patterson, 445 Mass. at 648, 654-655 (application of ACE-V methodology found to be reliable for single latent print impressions, but not for simultaneous impressions). But, here, the experts were testifying to the same type of ACE-V analysis at issue in our precedent and offered the analysis for the same purpose, namely, to establish that individual latent impressions likely match the defendant's prints. There was also no factual dispute that the Commonwealth's experts were qualified, that the experts followed the ACE-V methodology, or that the quality of the latent prints

was sufficient to permit an opinion.[8]  Accordingly, the application of the ACE-V methodology was reliable, and no evidentiary hearing was required.  See Commonwealth v. Pytou Heang, 458 Mass. 827, 845 (2011); Commonwealth v. Shanley, 455 Mass. 752, 763 n.15 (2010).

In essence, the defendant's argument is that the latent print examiners' testimony should have been excluded because the experts were exposed to biasing contextual information prior to their analyses.  However, when determining gatekeeper reliability as a preliminary question of fact, see Mass. G. Evid. § 104(a), "[t]he judge does not . . . determine whether to credit the expert's ultimate opinion; this is a matter of weight for the jury to decide," Commonwealth v. Hinds, 487 Mass. 212, 218 (2021).  The defendant's argument was, therefore, more

---

[8] The defendant argues on appeal that the testimony of both experts was unreliable because neither examiner was certified and the latent prints were unsuitable for comparison, but the defendant did not dispute these two facts before the trial judge.  "As the grounds for objection on this issue that were raised on appeal differ from the objection made at trial, the standard of review that applies to this claim is whether there was a substantial likelihood of a miscarriage of justice." Commonwealth v. Almeida, 479 Mass. 562, 568 (2018).  Both examiners worked for accredited laboratories, completed extensive training, and underwent periodic proficiency testing. Additionally, an independent latent print examiner from the Connecticut State forensic laboratory testified that the latent prints were suitable for comparison, and the defendant presented no evidence suggesting otherwise.  The defendant, therefore, cannot show a substantial likelihood of a miscarriage of justice based on these unpreserved objections.

appropriately addressed at trial when arguing against the weight of the evidence.  See Commonwealth v. Gaynor, 443 Mass. 245, 266 (2005) ("The judge did not abuse his discretion in ruling that the [DNA] test results were sufficiently reliable to be put before the jury and that the questions raised by the defendant [as to how certain conditions may have affected the accuracy and reliability of test results] were more appropriately addressed to the weight of the evidence").  The trial judge thus did not abuse her discretion in allowing, without an evidentiary hearing, the Commonwealth's experts to testify.

ii.  Confrontation of witnesses.  The defendant next argues that his rights under the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights to confront witnesses against him were violated due to Pivovar's testimony as to the verification step of ACE-V.  We have explained that "judges must use caution in allowing testimony regarding the verification step in ACE-V analysis, as 'verifying' suggests that a nontestifying expert concurs with the testifying expert's conclusion," which would be improper. Commonwealth v. Fulgiam, 477 Mass. 20, 46, cert. denied, 583 U.S. 923 (2017).  There is nonetheless no constitutional error where an expert "testified as to the ACE-V process, wherein verification or review by another [latent print] analyst is a step in the process, and did not testify as to the second

analyst's independent conclusions."  See id.  Compare
Commonwealth v. Chappell, 473 Mass. 191, 202 (2015) (no
constitutional violation where testifying analyst never "at any
time described any part of [nontestifying analyst's] DNA
analysis or [nontestifying analyst's] testing results, opinions,
or conclusions"), with Whitaker, 460 Mass. at 421-422 (violation
of right of confrontation where analyst "testified that, as part
of the verification stage of fingerprint examination, [other
nontestifying analysts] each compared the latent palm print
. . . with the known palm print of the defendant and concurred
with [testifying analyst's] opinion").

Here, one of the latent print examiners, Pivovar, testified
that the last step of ACE-V is "verification," which "is where
somebody else reviews my work."  Pivovar thus defined the
verification step in terms of a "review" and notably did not
describe any part of the other reviewer's analysis, results,
opinions, or conclusions.  In other words, there was no evidence
whether the other reviewer verified or disagreed with Pivovar's
findings.  We accordingly find no error.

iii.  Degree of certainty.  Lastly, the defendant argues
that the two latent print examiners testified as to their
conclusions with a degree of certainty that we have prohibited.
After expressing our concern about the ACE-V methodology in
Gambora, we explained that "[t]estimony to the effect that a

latent print matches, or is 'individualized' to, a known print, if it is to be offered, should be presented as an opinion, not a fact, and opinions expressing absolute certainty about, or the infallibility of, an 'individualization' of a print should be avoided." Gambora, 457 Mass. at 729 n.22. By the time of the trial in this case, we had further explained that latent print examiners "must clearly frame their findings in the form of an opinion to avoid improper testimony."[9] Fulgiam, 477 Mass. at 44.

The Commonwealth here presented two latent print analysts as experts, Dolan and Pivovar. Dolan testified multiple times that it was his "scientific opinion" that there were three latent prints that were "identified to" the palms of the defendant. The term "scientific" to describe his opinion "arguably verged on suggesting that the ACE-V process is more

---

[9] We have since provided further clarification on this issue in Commonwealth v. Robertson, 489 Mass. 226, 238, cert. denied, 143 S. Ct. 498 (2022). We explained there that "an expert testifying to a fingerprint match must state expressly that the match constitutes the expert's opinion based on the expert's education, training, and experience" and that it was the prosecutor's burden to ensure the expert does so. Id. That is,

> "If an expert witness does not clarify that his or her fingerprint testimony is an opinion, then the prosecutor must elicit this clarification even if the defendant does not object. For instance, the prosecutor may clarify that a subjective opinion is being sought and then ask whether the witness has an opinion 'to a reasonable degree of fingerprint analysis certainty.'"

Id. Robertson was decided after the defendant's trial, however, and was not made retroactive. See id.

scientific than warranted," Commonwealth v. Armstrong, 492 Mass. 341, 355 (2023), and there was one instance in which Dolan testified without using the term "opinion." We nonetheless conclude that there was no error because, "viewed as a whole," his testimony was largely expressed in terms of an "opinion" and his testimony did not claim that the ACE-V process was infallible or absolutely certain. See id. at 355-356.

On the other hand, Pivovar testified that she (i) "identified [a palm print from one of the garbage bags and the print of the defendant's left palm] as originating from the same source"; (ii) "identif[ied] [another latent print] and the right palm print of [the defendant] as being the same, they originated from the same source"; and (iii) "identif[ied] the [third latent print] as originating from the same source as the right palm of [the defendant] that [she] compared it to."[10] Pivovar did not frame her testimony in terms of an "opinion" and expressed the identification of the defendant with certainty. This was error. See Fulgiam, 477 Mass. at 45.

---

[10] The Commonwealth argued that Pivovar's testimony was expressed as an opinion because, prior to her three conclusions, the prosecutor had asked Pivovar for her "opinion." But we have stated that the experts themselves "must clearly frame their findings in the form of an opinion." Fulgiam, 477 Mass. at 44. Thus, we focus on the expert's testimony, not the prosecutor's questions, in this analysis.

The defendant did not preserve this issue through his motion in limine to exclude Pivovar's testimony "because the motion did not give the judge an opportunity to rule on the propriety of how the [latent print] expert would testify," nor did he object to the form of Pivovar's testimony at trial. See Commonwealth v. Robertson, 489 Mass. 226, 239, cert. denied, 143 S. Ct. 498 (2022). Accordingly, we review this error for a substantial likelihood of a miscarriage of justice. Id.

We conclude that Pivovar's testimony expressing her findings with certainty did not likely influence the jury's conclusion. See Commonwealth v. Hobbs, 482 Mass. 538, 556 (2019) (no substantial likelihood of miscarriage of justice where erroneously admitted evidence did not likely influence jury's conclusion). We note that defense counsel countered the notion that individualization under the ACE-V methodology is infallible by cross-examining Pivovar on the subjectivity of latent print analysis, the fact that two prints are never identical, and a recent incident in which the Federal Bureau of Investigation erroneously identified a suspect based on an incorrect latent print analysis. See Fulgiam, 477 Mass. at 45 (no substantial likelihood of miscarriage of justice because, in part, "portions of the analyst's testimony implicitly suggested the fallibility of fingerprint analysis"). The defendant also presented an expert detailing the risks of cognitive bias in

latent print analysis.[11]  See Armstrong, 492 Mass. at 357 (defendant's own expert helped counter misconception that individualization is infallible).

Additionally, the Commonwealth's other latent print examiner, Dolan, testified as to the same findings as Pivovar. If Pivovar's testimony had been properly framed as an opinion, there still would have been strong evidence that the prints found at Elizabeth's crime scene originated from the defendant. Thus, even though we determine that Pivovar's testimony was erroneously presented as fact, the error did not create a substantial likelihood of a miscarriage of justice.  See Fulgiam, 477 Mass. at 45 (no substantial likelihood of miscarriage of justice where Commonwealth's evidence was otherwise strong).

d.  Third-party culprit and inadequate police investigation evidence.  The defendant argues that he was improperly precluded from introducing evidence that a "suspicious" man was seen driving a blue Buick Skylark behind the strip mall where

---

[11] The defendant's expert explained that "[t]he human mind, the brain is not a camera" and "[w]e always ignore and interpret and pay attention to certain things and not other things."  The expert testified that, as a result, "when [experts] get contextual information, even if it's irrelevant, it clouds a judgment" and "[i]t contaminates the mental processes." Specifically, as applicable to this case, the expert testified that when latent print examiners receive irrelevant context, "it will affect their observation and interpretation."

Elizabeth's body was found on the night that her body was found. The defendant specifically contends that he should have been allowed to question certain Massachusetts law enforcement officers about this fact both to introduce evidence of a third-party culprit and to advance his theory that Massachusetts law enforcement failed to adequately investigate the possibility of this third-party culprit (i.e., a Bowden defense). See Commonwealth v. Bowden, 379 Mass. 472, 485-486 (1980).

Prior to admitting Bowden evidence, a trial judge should conduct a voir dire hearing to determine (1) "whether the third-party culprit information had been furnished to the police" and (2) "whether its probative value is substantially outweighed by the danger of unfair prejudice." Commonwealth v. Acevedo, 492 Mass. 381, 391 (2023), quoting Commonwealth v. Steadman, 489 Mass. 372, 385 (2022). The decision to exclude such evidence is reviewed for an abuse of discretion. Commonwealth v. Martinez, 487 Mass. 265, 270 (2021).

The trial judge here conducted voir dire of multiple officers, and the information regarding a blue Buick Skylark had been furnished to Massachusetts law enforcement, albeit not in its entirety until 2014. Regardless, there was little probative value to this evidence.

The probative nature of Bowden evidence is based on the inference that "evidence at trial may be inadequate or

unreliable because the police failed to conduct the scientific tests or to pursue leads that a reasonable police investigation would have conducted or investigated, and these tests or investigation reasonably may have led to significant evidence of the defendant's guilt or innocence." Commonwealth v. Silva-Santiago, 453 Mass. 782, 801 (2009). The defendant sought to introduce that a "suspicious" man was driving near the crime scene. Aside from the man's proximity to the crime scene, however, there were no other connections linking this unknown man to the crime. The argument that this man was involved in Elizabeth's murder was thus "no more than speculation and conjecture." See Martinez, 487 Mass. at 271. Accordingly, "even if the jury were to believe that police had failed to pursue certain avenues of investigation effectively, . . . this failure would only weakly have suggested that a third party had committed the crime," and "it was unlikely that the shortfalls of the investigation suggested by the proffered evidence 'could raise a reasonable doubt as to the defendant's guilt in the minds of the jurors.'" See Commonwealth v. Scott, 470 Mass. 320, 331-332 (2014).[12]

---

[12] Further, the defendant did introduce evidence that Connecticut law enforcement -- the officers responsible for determining the perpetrator of Elizabeth's murder -- did not investigate the records they obtained from the Connecticut department of motor vehicles listing thousands of blue Buick Skylark owners. The defendant was, therefore, able to argue his

In light of the foregoing, the trial judge did not abuse her discretion in excluding this Bowden evidence after weighing the limited or nonexistent probative value of the evidence against the risk of unfair prejudice to the Commonwealth.

Lastly, the defendant was not precluded from presenting third-party culprit evidence as to the "suspicious" man in the blue Buick Skylark, because the defendant never requested to do so. Defense counsel expressly stated at trial that he intended to introduce this evidence solely to demonstrate that the police failed to investigate and not to demonstrate that a third party was culpable. Where a defendant never attempted to introduce evidence and, therefore, a trial judge never precluded such evidence, the trial judge could not have abused her discretion. See Commonwealth v. Feliciano, 442 Mass. 728, 737 (2004).[13]

---

Bowden defense to some extent. See Scott, 470 Mass. at 332 ("Also relevant to our analysis is the fact that the judge did allow the defendant to pursue a number of lines of questioning and argument in support of a Bowden defense").

[13] Nothing in our review pursuant to G. L. c. 278, § 33E, suggests that defense counsel's failure to pursue this strategy constituted ineffective assistance of counsel. As explained supra, the argument that this man was involved in Elizabeth's murder was speculative. Accordingly, any attempt to introduce this evidence for the purpose of proving that a third-party culprit committed Elizabeth's murder would have been futile. See Commonwealth v. Heywood, 484 Mass. 43, 49 (2020), citing Commonwealth v. Carroll, 439 Mass. 547, 557 (2003) ("failure to pursue futile tactic does not constitute ineffective assistance of counsel"); Silva-Santiago, 453 Mass. at 801 (third-party culprit evidence "cannot be too remote or speculative" [citation omitted]).

e.  Review pursuant to G. L. c. 278, § 33E.  In addition to his other arguments, the defendant asks us to consider several issues in our G. L. c. 278, § 33E, review.  We address each issue, as well as an issue raised by the Commonwealth, infra.  In short, neither the issues identified by the parties nor our independent review causes us to reduce the verdict of murder in the first degree or to order a new trial.

i.  Motion to suppress.  The defendant suggests defense counsel was manifestly unreasonable in failing to seek suppression of the defendant's statements to police.  However, there is no indication that the defendant was in custody during his first conversation with police, which would have required Miranda warnings, nor is there any indication on the trial record that the defendant made his statements involuntarily.  A motion to suppress thus would have been futile, and defense counsel was not manifestly unreasonable in declining to file such a motion.  See Gambora, 457 Mass. at 731 n.24.

ii.  Interview transcript redaction.  In a pretrial motion, the defendant requested that certain excerpts from the transcript of his interview with police be redacted.  In particular, the defendant argued that police statements opining as to the defendant's guilt were inadmissible hearsay.  Indeed, "[e]xtrajudicial accusatory statements made in the presence of a defendant, which he has unequivocally denied, are hearsay and

inadmissible as evidence of guilt in the Commonwealth's case-in-chief" (footnotes omitted). Commonwealth v. Womack, 457 Mass. 268, 272 (2010). But almost all the excerpts that the defendant requested be redacted due to this issue were redacted. Accusations and responses that were left in the transcript were admissible because the defendant "respond[ed] to incriminating accusations made of him in an equivocal, evasive or irresponsive way inconsistent with his innocence." Commonwealth v. Machado, 339 Mass. 713, 715-716 (1959), abrogated on other grounds by Commonwealth v. Forde, 392 Mass. 453 (1984).

iii. Evidence of arson. The defendant filed pretrial motions to admit evidence that two individuals set fire to a Ford Explorer in Tolland on September 30, 1995. The trial judge denied both motions. The defendant intended to use this evidence to show that there was a third-party culprit and that police failed to adequately investigate this possibility. But the only evidence connecting Marcia's death to the arson was the fact that this other crime occurred in the same town and on or around the same day that Marcia was murdered. The defense theory that the arson was connected with Marcia's murder was thus entirely speculative, as there was no "other information that potentially linked [the two individuals] to the crime" or even the specific crime scene. See Silva-Santiago, 453 Mass. at 801. We thus find no error.

iv. Commonwealth's closing argument. During the Commonwealth's closing argument, the prosecutor referred to the fact that only one person was seen during the jury's viewing of the campground crime scene to support his argument that Tolland State Forest is remote. The defendant objected to this statement following the prosecutor's closing argument. We agree with the defendant that this reference was improper because "the view itself is not evidence in a strict sense." See Commonwealth v. Brea, 488 Mass. 150, 168 (2021). We nonetheless conclude that no prejudice occurred because the remark was minor, considering that there was other evidence that Tolland State Forest was remote, and because the judge provided an effective curative instruction. See Commonwealth v. Hammond, 477 Mass. 499, 507 (2017).

The prosecutor also made a remark during closing that suggested the defendant considered his daughter "trash" because he put her body in a garbage bag. The prosecutor's remark was improper, as it did not pertain to whether the defendant was guilty but rather attempted to play on the jury's sympathy and emotions. See Commonwealth v. Kolenovic, 478 Mass. 189, 201 (2017). However, here, too, we conclude that there was no prejudice: it was one isolated remark, it was "unlikely that the prosecutor's argument had an inflammatory effect on the jury beyond that which naturally would result from the evidence

presented [that showed the circumstances in which the body was left]," and the trial judge gave proper instructions that closing arguments are not evidence and that the jury must not in any way be influenced by sympathy, emotion, or prejudice. See id. at 201-202, quoting Commonwealth v. Bois, 476 Mass. 15, 35 (2016).

v. Jury instructions. The defendant made the following objections to jury instructions at the charge conference, all of which were overruled: (i) the definition of deliberate premeditation did not include the phrase "cool reflection"; (ii) the instruction for deliberate premeditation did not include that consciousness of guilt evidence may not be a factor considered; and (iii) there was no Bowden instruction. There was no error. See Commonwealth v. Felix, 476 Mass. 750, 761 (2017) (no error where deliberate premeditation instruction excluded phrase "cool reflection"); Commonwealth v. Durand, 475 Mass. 657, 674 (2016), cert. denied, 583 U.S. 896 (2017) ("a judge is not required to instruct on the claimed inadequacy of a police investigation" [citation omitted]); Commonwealth v. Dagenais, 437 Mass. 832, 844 (2002) ("where a judge gives correct instructions on consciousness of guilt and correct instructions on deliberate premeditation, there is no need to further instruct the jury as to limitations on the use of

consciousness of guilt with respect to the issue of premeditation").

The defendant also objected to the third-prong malice instruction in the jury instruction on murder in the second degree. Regardless of whether there was an error, the defendant was not found guilty of murder in the second degree, so there was no prejudice. See Reyes, 483 Mass. at 78.

Lastly, although there was no instruction that the jury must disregard the defendant's statements to police unless the jurors found that the defendant made the statements voluntarily, such an instruction was not required here. See Commonwealth v. Gallett, 481 Mass. 662, 686 (2019) (instruction regarding voluntariness of statement not required where defendant does not put forward "substantial evidence" of involuntariness).

vi. Sleeping juror. Although not raised by the defendant, the Commonwealth notes that the trial judge received a report that a juror slept through the testimony of defense's expert. "A judicial observation that a juror is asleep, or a judge's receipt of reliable information to that effect, requires prompt judicial intervention . . . ." Commonwealth v. Alleyne, 474 Mass. 771, 778 (2016), quoting Commonwealth v. Beneche, 458 Mass. 61, 78 (2010). The judge must determine whether the report of a juror sleeping is reliable, and if it is, the judge "must take further steps to determine the appropriate

intervention."  Commonwealth v. Villalobos, 478 Mass. 1007, 1007-1008 (2017), quoting Commonwealth v. McGhee, 470 Mass. 638, 644 (2015).  The trial judge has "substantial discretion" in determining the appropriate intervention, and the defendant bears the burden of showing "that the judge's response to information about a sleeping juror was 'arbitrary or unreasonable.'"  Villalobos, supra at 1008, quoting McGhee, supra.

Here, two court officers stated that a juror looked like she was "dead asleep through virtually all of [the defendant's expert's] testimony."  Defense counsel first responded to this report by stating that his co-counsel thought that the same juror was asleep at some point, but that the juror "picked up her head" when defense counsel looked over to the juror.  Then, later, defense counsel stated that they did not "think [they could] discuss it any further," implying that they did not believe it was a real or substantial issue.  Defense counsel also agreed that no other intervention was necessary and that the "juror [did] not need to be excused for any reason."  Considering that the evidence was tentative whether the juror was indeed sleeping and that defense counsel agreed that no further intervention was necessary, the trial judge did not act arbitrarily or unreasonably.  See Alleyne, 474 Mass. at 778.

vii.  <u>Our independent review</u>.  Lastly, we have otherwise reviewed the entire record and find no basis to set aside the verdict of murder in the first degree or to order a new trial pursuant to our authority under G. L. c. 278, § 33E.

<u>Judgment affirmed</u>.